AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

OCT – 9 2020

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| NATHAN WILSON,<br>aka "yup_i_eat_crayons," | Case No.<br><br>20 MJ04919 |
| Defendant. | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 31, 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 844(f)(1) | Malicious Damage to Property Owned by an Institution or Organization Receiving Federal Financial Assistance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Michael Fukuda, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  10/9/20

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Michael Fukuda, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against NATHAN WILSON ("WILSON"), also known as "yup_i_eat_crayons," for a violation of 18 U.S.C. § 844(f)(1): Malicious Damage to Property Owned by an Institution or Organization Receiving Federal Financial Assistance.

2.   This affidavit is also made in support of an application for a warrant to seize and search two digital devices (collectively, the "SUBJECT DEVICES"), seized on October 9, 2020, and currently maintained in the custody of the Santa Monica Police Department in Santa Monica, California, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 844(f)(1): Malicious Damage to Property Owned by an Institution or Organization Receiving Federal Financial Assistance (the "Subject Offense"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended merely to show that there

2

is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and part only.

## II. **SUMMARY OF PROBABLE CAUSE**

5.   On May 31, 2020, a SMPD car was destroyed by arson.
The SMPD applies for and receives federal funds annually,
including in 2020, and 18 U.S.C. § 844(f)(1) makes it a federal
crime to maliciously damage property owned by an institution or
organization receiving federal financial assistance.  Video
footage captured the incident and the perpetrator, who was
wearing a distinctive American flag bandana around his face and
other identifying apparel.  Other photographs and video taken of
the perpetrator that day depict what appears to be the same
person wearing the same clothing, only with the American flag
banana lowered around the person's neck, exposing the person's
entire face.  The person's distinctive left-arm tattoo is also
visible.

6.   In September 2020, Orange County law enforcement were
investigating a separate car fire.  This car belonged to A.D.,
who said that he/she had driven WILSON to Santa Monica on May
31, 2020, and that he/she believed WILSON had set fire to a
police car while there.  Upon searching the public Instagram
page A.D. said belonged to WILSON, law enforcement found a
"selfie" photograph of WILSON at the scene of the May 31, 2020

3

SMPD car fire, wearing the American flag bandana.  Other photographs on the Instagram page appear to show WILSON wearing apparel consistent with how the perpetrator appeared at the May 31, 2020 SMPD car fire, with the same left-arm tattoo.  The Instagram photographs and the May 31, 2020 videos and photographs are also consistent with WILSON's California driver's license photograph, except that WILSON's hair now appears to be blonder.

7.  On October 9, 2020, law enforcement executed a state search warrant on A.D.'s residence and found WILSON hiding inside.

### III. BACKGROUND OF SPECIAL AGENT FUKUDA

8.  I have been a Special Agent ("SA") with the FBI since September 2008.  From May 2015 through September 2019, I was assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, specifically the Los Angeles Metropolitan Task Force on Violent Gangs.  From September 2019 to the present, I have been assigned to the Violent Crimes Squad, where I investigate violent crimes, including such crimes as Hobbs Act robberies and bank robberies.

9.  I have also participated in the investigation of arson, where I use a variety of investigative techniques, including reviewing physical evidence, reviewing surveillance images and cellular telephone data, and speaking with law enforcement agents and officers.  As a result of this experience and my conversations with other law enforcement personnel,

including FBI Special Agents and Local Law Enforcement Detectives experienced with arson investigations, I am familiar with the methods used by individuals to commit arson, as well as effective investigative methods to solve them.

10. I have received basic training (Cellular Survey Analysis and Geo-location) from the FBI Cellular Analysis and Survey Team ("CAST"), which included utilizing cellular tower logs to identify subject phones of different crimes, even when it was not clear whether a cell phone was in use during the commission of the crime. I have also analyzed tower dump data sets and historical cell site data sets in my own investigations.

### IV. STATEMENT OF PROBABLE CAUSE

11. Based on my review of law enforcement reports, conversations with other state, local, and federal law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

#### A. An SMPD Car is Destroyed by Fire

12. At about 8:00 a.m. on May 31, 2020, SMPD Sergeant Erika Aklufi parked and locked her SMPD-issued car -- a silver, unmarked 2009 Ford Crown Victoria (the "SMPD Car") -- in a parking spot at the Santa Monica Civic Center loading dock, which abuts the Santa Monica Civic Center, in Santa Monica, California, within the Central District of California. When Sergeant Aklufi returned to the SMPD Car at about midnight, she found the SMPD Car was entirely burned, with essentially just a shell remaining.

13.  Earlier that day, at about 5:14 p.m., Santa Monica
Fire Dispatch had received a 9-1-1 call reporting that the SMPD
Car was on fire in the loading area of the Santa Monica Civic
Center parking lot.  Firefighters extinguished the fire, but by
then, the car was thoroughly burned and destroyed.  Santa Monica
City maintenance personnel later concluded that there was
nothing salvageable on the car.

14.  I have reviewed a copy of the SMPD Car's registration
information, issued by the California Department of Motor
Vehicles ("DMV").  The registration provides that the registered
owner of the SMPD car is the City of Santa Monica.

**B.    Publicly-Available Videos Show the SMPD Car Before,
During, and After the Fire**

15.  Following the SMPD Car fire, SMPD officers used Google
to search the Internet for publicly-shared videos and
photographs of the SMPD car fire on May 31, 2020.  Officers
found multiple videos appearing to show the SMPD Car parked in
the Santa Monica Civic Center loading dock lot, the events
leading up to the SMPD Car fire, the fire itself, and its
aftermath.

16.  I reviewed a publicly-available video, posted to the
"Facebook Live" feature of C.B.'s Facebook page on May 31, 2020
(the "C.B. Video").  The C.B. Video shows the following, in
substance and in part:

a.    A crowd of people are surrounding the SMPD Car,
which has graffiti painted all over it.  The SMPD Car's door and
front hood are open, exposing the engine block.  People are

using skateboards to strike the car.  People around the SMPD car
appear to be taking photos and/or videos.  In the crowd, about
three to six feet from the SMPD Car, is the person later
identified as WILSON: a White male appearing to be in his 20s,
with blondish-brownish hair, wearing a backwards baseball hat
with the logo "DONPISTO," a brown leather analog watch with a
gold bezel, green/khaki pants, brown dress shoes with black
laces, a grey shirt with aviator sunglasses tucked into it, and
an American-flag bandana around his face covering his nose and
mouth.

     b.   An unknown person appears to be leaning into the
front passenger side of the SMPD Car and manipulating a yellow
poster.  While a small amount of smoke appears to come out of
the car, the yellow poster does not appear to be actively on
fire.  That person then leaves the scene, not carrying the
yellow poster.

     c.   Another person walks up to the front passenger
side of the SMPD car and manipulates the yellow poster.  The
person then leaves the SMPD car, not carrying the yellow poster.
After that second person left the SMPDF car, it does not appear
that either the car or the yellow poster is on fire, although
some smoke seems to be coming from the front passenger side of
the SMPD car.

     d.   The person later identified as WILSON then
approaches the front passenger side of the SMPD Car and begins
manipulating the yellow poster.  The man filming the C.B. Video
asks if anyone had a lighter, and he then asks WILSON, "is it

7

working?" and then instructs WILSON to "let it catch first."
The yellow poster is now visibly on fire, and WILSON can be seen
holding the poster against the car seat, appearing to try to
light to car seat on fire using the yellow poster.

      e.   Someone in the crowd yelled, "5-0," which I know
in my training and experience is vernacular for "police."  The
C.B. Video shows the crowd around the SMPD Car quickly
dispersing.  As the person filming the C.B. Video also jogs away
from the SMPD Car, the video pans back to the SMPD Car and shows
that the SMPD car is emitting thick black smoke.

      i.   Based on my training and experience, and
because no other person attempted to light the SMPD Car on fire
following WILSON's attempt, I believe that it was WILSON's
attempt that succeeded in lighting the SMPD Car on fire.

      f.   A few seconds later, the person filming the C.B.
video and the rest of the crowd appear to see that no police are
coming, and they walk back to the SMPD Car.  The C.B. Video
shows that floorboard area of the front passenger seat is
actively on fire, and an unidentified person uses the active
fire to light a cigarette or joint.

    17.  I have reviewed a video, posted to YouTube on or about
May 31, 2020 ("YouTube Video 1"), and I know that the video
depicts the following, in substance and in part:

      a.   The SMPD Car emits thick black smoke, and
bystanders pose for photographs on the car and near the car.
WILSON can be seen off to the side of the burning car, taking
what appears to be a selfie.

i.    Based on my training and experience as an SA, and from my life experience, I know that a "selfie" is an image that includes oneself (sometimes alone, and sometimes with another person or as part of a group) and is taken by oneself, usually via cell phone camera.

b.    When the SMPD Car is completely engulfed in flame, the crowd backs up from it, putting distance between themselves and the SMPD Car. WILSON, wearing the same clothing, was among the last to linger around the SMPD Car.

18. I have reviewed a second video, posted to YouTube on or about June 1, 2020 ("YouTube Video 2"), and know that the video depicts the following, in substance and in part:

a.    WILSON, wearing the same clothing, can be seen watching the conflagration from the sidewalk just outside the parking lot. By this time, the SMPD Car is completely engulfed in flame. WILSON continues watching the fire while pacing up and down the sidewalk and, at one point, began crossing the street and walking toward the camera.

C.    **WILSON is Captured in Other Photographs and Video on May 31, 2020**

19. SMPD officers were investigating the May 31, 2020 burglary and vandalism of a Santa Monica business and, during their investigation, received a video and photographs captured by the business owner on May 31, 2020. SMPD Officers also spoke with the business owner and summarized the interview in a report. I have reviewed the report, photographs, and video, and

I have also spoken with SMPD officers with personal knowledge of the investigation.  From these sources, I learned the following:

a.   The business owner reported seeing a person walk up and down the block of his/her business.  The person pulled what appeared to be rocks from his pockets and broke windows belonging to businesses on the south side of the street.

b.   The business owner took a video and photographs of the person later identified as WILSON.  These video and photographs appear to be dated "May 31, 2020," and have time stamps ranging between 5:58 p.m. to 6:24 p.m.  WILSON was wearing the same green/khaki pants, grey shirt, backwards hat, aviator sunglasses, brown shoes, and watch on his left wrist that he wore in the C.B. Video, YouTube Video 1, and YouTube Video 2.  WILSON is also wearing an American flag bandana, except unlike in the C.B. Video, YouTube Video 1, and YouTube Video 2, the bandana is now lowered around WILSON's neck, and WILSON's face is visible.  WILSON also has a tattoo on the outside of his left arm.  The tattoo appears to depict a long gun with the barrel facing upward toward WILSON's shoulder.

**D.   Law Enforcement Issues a Reward Flyer**

20.  In early June 2020, the FBI and SMPD issued a reward flyer that depicted several images of the person later determined to be WILSON, and asked for any information that might lead to the then-unknown person's arrest.

21.  Law enforcement received responses to the flyer and investigated each credible lead.  After performing interviews

and further investigation, law enforcement ruled out each of
these leads.

**E.   A Domestic Incident Leads Law Enforcement to Identify
WILSON**

22.  From my discussions with Orange County arson
investigators and other law enforcement, and from my review of
law enforcement reports, I am aware of the following:

a.   On September 28, 2020, Orange County arson
investigators received a call reporting a possible vehicle arson
in the City of Irvine, Orange County, California.  The reporting
party and alleged victim, A.D., reported that his/her car had
been set on fire.  As investigators spoke with A.D., he/she told
them that he/she had just had a lengthy argument with WILSON,
who was his/her live-in boyfriend, after which time WILSON left
A.D.'s residence but did not take his belongings with him.  A.D.
then found that his/her car had been set on fire.  A.D. also
told police that A.D had driven WILSON to Santa Monica on May
31, 2020, and A.D. believed that WILSON set a police car on fire
there.

b.   A.D. provided law enforcement with the Instagram
account name he/she identified as WILSON's, which is identified
by the Instagram username "yup_i_eat_crayons" ("WILSON's
Instagram").

i.   Based on my training and experience, I know
that Instagram is a social media platform that users typically
access via installed application on their cell phone.  Using
accounts that users usually set up themselves, Instagram users

often post photographs of themselves, life events, friends, and/or family.  Often times, these posted photographs contain captions written by the poster, who is often the user.

        c.    I have reviewed WILSON's Instagram, which is non-private and open to the public, and learned the following, in substance and in part:

            i.    WILSON's Instagram account posted a photo on May 31, 2020, which was tagged as having been taken in Santa Monica, California.  The photograph appears to be a selfie showing WILSON in front of the SMPD Car burning in the background.  In the selfie, WILSON is wearing what appears to be the same grey shirt, backwards hat, aviator sunglasses, and American flag bandana as he wore in the C.B. Video, YouTube Video 1, and YouTube Video 2.  Someone asked in a comment to this photograph, "Is that a police car" and the WILSON Instagram replied, "yes."

            ii.   WILSON's Instagram account posted another photograph on May 31, 2020.  This photograph depicts an intersection in Santa Monica with police officers in riot gear. The WILSON Instagram posted a caption to the photograph: "Santa Monica earlier today at the start of a peaceful protest that then turned into a full riot instigated by the police."

            iii.  The WILSON Instagram has numerous posted photographs in 2020 appearing to depict WILSON's face, consistent with the C.B. Video, YouTube Videos 1 and 2, and the business owner's photographs and video.  Some of the WILSON Instagram photographs show WILSON's left-arm tattoo, and it

appears to be the same tattoo depicted in the business owner's photographs and video from May 31, 2020.  Also, in many of the WILSON Instagram photographs, WILSON is wearing an American flag bandana around his neck/face, brown dress shoes, and/or a brown analog watch with a gold bezel, consistent with the bandana, watch, and shoes WILSON wore in the C.B. Video, YouTube Videos 1 and 2, and the business owner's photographs and video.

      d.   Law enforcement looked up WILSON in the DMV database and found WILSON's biographical information and driver's license photograph, which was taken in 2016.  WILSON's driver's license photograph is consistent with the person who appears in the Instagram photographs, C.B. Video, YouTube Videos 1 and 2, and the business owner's photographs and video, except that WILSON's driver's license photograph shows him with brown hair, whereas WILSON's hair now appears to be blonder.

**F.    Law Enforcement Executes a State Search Warrant on A.D.'s Residence**

    23.   On October 9, 2020, law enforcement executed a state search warrant on A.D's residence, which authorized the search for and seizure of WILSON's belongings, including the watch, hat, clothing, and other effects visible in the C.B. Video, YouTube Videos 1 and 2.  Based on my involvement in this investigation, my conversations with other law enforcing, and my review of the property report in this case, I know that, while executing that warrant, law enforcement found the following, in substance and in part:

     a.   WILSON hiding in the box spring of the mattress in the bedroom;

     b.   A clear plastic bin in the kitchen containing:

        i.   Men's clothing, including green/khaki pants.

        ii.  A box labeled "LG Aristo 4+" bearing IMEI Number 352375-11-059785-3, which appeared to once belong to a cell phone, inside of which was an analog watch with gold bezel and brown leather wristband and a Navy Federal Credit Unit Visa card in WILSON's name.

     c.   In a tote bag in the bedroom, a wallet belonging to WILSON, containing WILSON's Washington State identification card and various cards in WILSON's name;

     d.   In the bedroom closet, a black and white baseball hat with the logo "DONPISTO."

     e.   Aviator-style sunglasses on a shelf in the hallway closet;

     f.   In a drawer in the bathroom, a black iPhone with a cracked screen with no visible serial number; and

     g.   Inside of a bedroom closet, an LG phone with an IMEI number 352375-11-059785-3, which matches the IEMI number on the LG box where the watch and Visa card were found.

24. WILSON was arrested by SMPD Officers based on their probable-cause belief that he had burned the SMPD car on May 31, 2020. He is currently in SMPD custody.

14

G.   **The SMPD is an Institution and Organization that Receives Federal Financial Assistance**

25. Based on my discussions with SMPD officers and from my review of SMPD documents, I am aware of the following:

a.   The SMPD applies for and receives federal grants every year, including in 2020. For example, in 2020, the City of Santa Monica received a Justice Access Grant ("JAG") from the Department of Justice, Office of Justice Programs, which went to fund criminal justice initiatives, including law enforcement programs.

b.   A 2014 letter from the Department of Justice, Office of Justice Programs, notified Santa Monica officials that the City had been awarded a JAG. The JAG funds were allocated for the SMPD's purchase of equipment for a command post vehicle.

c.   The SMPD also received federal funds via a JAG in 2015.

26. Based on this information, I believe that the SMPD is an institution and organization that receives federal financial assistance, within the meaning of 18 U.S.C. § 844(f)(1).

## V.   TRAINING AND EXPERIENCE ON ARSON OFFENSES

27. Based on my training and experience and familiarity with investigations into arson, and from discussions with other law enforcement agents, I know the following:

a.   Arson often involves co-conspirators, aiders, and abettors, from the person or people who actually start a fire, to those who give instructions about fire-starting or help conceal evidence of the arson.

15

b.    Arsonists often use the Internet, including social media applications such as Instagram and Facebook, to learn how to (or to share information about how to) construct, use, store, find, sell, and communicate about fires and fire-starting devices.  Oftentimes, these searches or instances of information-sharing take place on their cell phones and other Internet-connected digital devices.

c.    Communications between people engaging in or interested in engaging in arson take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the fires they have set, fires set by others, and fire-starting devices, and discussion of plans to set fires.  In addition, it is common for arsonists to have photos and videos on their cell phones of arson and fires, as they frequently send these photos to each other and others to boast about fires they have started, explosive devices they have used, or to facilitate further use of explosive devices or fire-starting devices.

d.    Arsonists often keep the names, addresses, and telephone numbers of other arsonists and those who aid and abet them on their digital devices.  Arsonists often keep records of meetings with associates, aiders, and abettors on their digital devices, including in the form of calendar entries and location data.

16

e.    Individuals engaged in arson often use multiple digital devices and store photographs, communications, and media on those multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

17

evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

30.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,

18

often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

      b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    31. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

//

//

//

19

## VII.  <u>CONCLUSION</u>

32.  For all of the reasons described above, there is probable cause to believe that WILSON has committed a violation of 18 U.S.C. § 844(f)(1): Malicious Damage to Property Owned by an Institution and Organization Receiving Federal Financial Assistance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


MICHAEL FUKUDA,
FBI Special Agent

Subscribed to and sworn before me
this _9th_ day of October, 2020.


THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE