UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| V. | ) |
| | ) CR 20-00516-FMO |
| | ) |
| | ) LOS ANGELES, CALIFORNIA |
| NATHAN WILSON, | ) |
| | ) JUNE 28, 2021 |
| | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |

REVIEW/RECONSIDERATION OF BAIL/DETENTION ORDER-BOND HEARING

BEFORE THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:              SEE NEXT PAGE

COURT REPORTER:          RECORDED; BOX

COURTROOM DEPUTY:        DONNAMARIE LUENGO

TRANSCRIBER:             DOROTHY BABYKIN
                         COURTHOUSE SERVICES
                         1218 VALEBROOK PLACE
                         GLENDORA, CALIFORNIA  91740
                         (626) 963-0566

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

1    APPEARANCES:

2    FOR THE PLAINTIFF UNITED STATES OF AMERICA:

3
               TRACY L. WILKISON, ACTING
4              UNITED STATES ATTORNEY
               LAWRENCE MIDDLETON
5              CHIEF, CRIMINAL DIVISION
               ASSISTANT UNITED STATES ATTORNEY
6              BY:  SARA MILSTEIN
               ASSISTANT UNITED STATES ATTORNEY
7              GENERAL CRIMES SECTION
               13TH FLOOR
8              312 NORTH SPRING STREET
               LOS ANGELES, CALIFORNIA  90012

9

10   FOR THE DEFENDANT NATHAN WILSON: (APPEARING BY VIDEO CONFERENCE
     FROM MDC)

11

12             CUAUHTEMOC ORTEGA, INTERIM
               FEDERAL PUBLIC DEFENDER
13             BY:  HOWARD SHNEIDER
               DEPUTY FEDERAL PUBLIC DEFENDER
14             321 EAST 2ND STREET
               LOS ANGELES, CALIFORNIA  90012

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2    CR 20-00516-FMO                              JUNE 28, 2021

3

4    PROCEEDINGS:   REVIEW/RECONSIDERATION OF BAIL/DETENTION
                    ORDER-BOND HEARING
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              LOS ANGELES, CALIFORNIA; JUNE 28, 2021

2              THE CLERK:  THE HONORABLE ROZELLA A. OLIVER, UNITED

3    STATES MAGISTRATE JUDGE IS PRESIDING.

4              CALLING CASE CR 20-516, UNITED STATES OF AMERICA

5    VERSUS NATHAN WILSON.

6              APPEARANCES, PLEASE, COUNSEL.

7              MS. MILSTEIN:  GOOD AFTERNOON, YOUR HONOR.

8              SARA MILSTEIN ON BEHALF OF THE UNITED STATES.

9              THE COURT:  GOOD AFTERNOON.

10             MR. SHNEIDER:  GOOD AFTERNOON, YOUR HONOR.

11             HOWARD SHNEIDER ON BEHALF OF MR. WILSON, WHO IS

12   APPEARING BY WAY OF VIDEO CONFERENCE FROM MDC.

13             THE COURT:  OH, GREAT.

14             THANK YOU.

15             GOOD AFTERNOON, MR. WILSON.

16             CAN YOU HEAR US FROM THERE?

17             THE DEFENDANT:  YES, MA'AM.

18             THE COURT:  GREAT.  GREAT.

19             THE DEFENDANT:  YES, MA'AM.

20             GOOD AFTERNOON.

21             THE COURT:  GOOD AFTERNOON.

22             AND THEN YOUR ATTORNEY IS HERE IN THE COURTROOM.  I

23   DON'T KNOW --

24             THE DEFENDANT:  I CAN SEE HIM.

25             THE COURT:  I HOPE -- CAN YOU SEE HIM?  OH, GOOD.

5

1    GOOD.

2                THE DEFENDANT:  YEAH.  YEAH.  HE'S RIGHT NEXT TO YOU.

3                THE COURT:  GOOD.  GOOD.  I'M GLAD.

4                BEFORE WE DIDN'T DO THAT, AND I THOUGHT IT WAS

5    DISCONCERTING FOR ALL.

6                ALL RIGHT.  MR. SHNEIDER, WE'RE HERE TODAY FOR A

7    RENEWED -- ON A BAIL RECONSIDERATION MOTION.

8                IN PREPARATION FOR TODAY I REVIEWED THE APPLICATION

9    PLUS YOUR BRIEF IN SUPPORT.

10               I ALSO REVIEWED THE GOVERNMENT'S OPPOSITION.  AND

11   THEN I VIEWED -- I'VE REVIEWED YOUR REPLY.

12               I DID APPRECIATE -- I'LL SAY TO BOTH COUNSEL -- THE

13   PROCEDURAL HISTORY OF HAVING TAKEN THIS TO THE DISTRICT JUDGE,

14   WHICH I WAS UNAWARE OF.  SO, I DID VERY MUCH APPRECIATE THAT.

15               I GUESS THE ONE THING THAT I HAVEN'T -- AND I'M A

16   LITTLE CONCERNED THAT I MISSED SOMETHING, MR. SHNEIDER.

17   BECAUSE THE PRETRIAL SERVICES REPORT TALKS ABOUT POTENTIALLY

18   RESIDING -- MR. WILSON RESIDING WITH THE GRANDPARENTS.

19               AND THEN WHERE I LEFT OFF, WHICH WAS I KNOW THAT IT

20   WAS A WHILE AGO THAT THE PAPERWORK WAS FILED -- THAT THE PLAN

21   WAS THAT MR. WILSON RESIDE WITH HIS SISTER.

22               SO, I DON'T KNOW IF I -- DID I MISS SOMETHING OR IS

23   THERE AN UPDATE?

24               MR. SHNEIDER:  NO.  THERE'S AN UPDATE.

25               AND IF YOUR HONOR WANTS FURTHER BRIEFING ON THAT, I'M

6

1   HAPPY TO DO THAT.  BUT IT WAS -- THE TIME WAS SUCH THAT IT WAS

2   VERY SHORT NOTICE TO ME AS WELL.

3           I WILL SAY THAT MR. WILSON IS STILL WELCOME TO RESIDE

4   WITH HIS SISTER IN RED BLUFF AS WELL AS HIS PARENTS IN

5   OCEANSIDE.  THEY ARE BOTH OPTIONS.

6           WHAT HAPPENED WAS IN THE -- SOMETIME LAST WEEK -- I

7   FORGET WHEN, AND I WAS OUT OF THE OFFICE DOING A RULE 15

8   DEPOSITION SO I WAS NOT FULLY PLUGGED IN.  BUT AT SOME POINT

9   LAST WEEK IT WAS COMMUNICATED TO ME BY MR. WILSON THAT HIS

10  GRANDPARENTS DONNA JAMES AND BRUCE JAMES MAY BE WILLING TO LET

11  HIM LIVE WITH THEM.

12          AND I CONTACTED THEM AT SOME POINT LAST WEEK.  AND I

13  THINK I GOT THE FINAL CONFIRMATION FROM THEM AROUND THURSDAY

14  THAT HE COULD LIVE WITH THEM.

15          AND I BELIEVE I NOTIFIED PRETRIAL LATE IN THE DAY

16  THURSDAY, LIKE IN THE EVENING TIME.  AND I THINK I LET MS.

17  MILSTEIN KNOW ON FRIDAY PROBABLY LATE IN THE DAY.

18          SO, I APOLOGIZE FOR ALL THE LAST-MINUTE NOTIFICATION

19  --

20          THE COURT:  WELL --

21          MR. SHNEIDER:  -- OF ALL OF THIS.  BUT THAT IS WHY

22  THAT'S IN THE REPORT.

23          AND THE REASON I'M PUTTING FORWARD HIS GRANDPARENTS

24  AS A RESIDENCE IN ADDITION TO OR INSTEAD OF HIS SISTER IS

25  BECAUSE MR. WILSON HAS LIVED MOST OF HIS LIFE WITH THEM.  AND

7

1 THEY REALLY HAVE SERVED AS HIS PARENTS.

2          WHEN MR. WILSON WAS VERY YOUNG HIS FATHER LEFT.  AND

3 THEN HIS MOTHER STRUGGLED WITH ADDICTION ISSUES.  AND AT SOME

4 POINT HE WAS TAKEN AWAY FROM HER AND RESIDED WITH BRUCE JAMES

5 AND DONNA JAMES SINCE HE WAS APPROXIMATELY FIVE YEARS OLD UNTIL

6 ABOUT 18 YEARS OLD.  AND THEY DID ACTUALLY FORMALLY ADOPT HIM

7 AS WELL.  AND THEY HAD PROVIDED A STABLE RESIDENCE FOR HIM

8 THEN.

9          AND I THINK BASED ON THE INFORMATION IN THE PRETRIAL

10 SERVICES REPORT AND ALSO THE INFORMATION I GLEANED FROM TALKING

11 BOTH WITH HIS SISTER AND WITH HIS GRANDPARENTS IT'S -- I DO

12 THINK HIS GRANDPARENTS SERVE AS A MORE STABLE RESIDENCE FOR A

13 VARIETY OF REASONS.  AND, SO, I DO THINK THEY WOULD BE A BETTER

14 SITUATED PLACE FOR HIM TO LIVE IF THE COURT WERE WILLING TO

15 GRANT BOND.

16          THE COURT:  I'M SURE YOU CAN ANTICIPATE MY QUESTION,

17 WHICH IS, IT DOESN'T APPEAR THAT WE HAVE ALL THE INFORMATION WE

18 NEED THERE IN TERMS OF BEING ABLE TO COMMUNICATE WITH THEM AS

19 REFLECTED IN THE REPORT.

20          MR. SHNEIDER:  WELL, MY READING OF THE REPORT IS THAT

21 PRETRIAL DID COMMUNICATE WITH THEM AND CONFIRMED THE

22 INFORMATION.

23          I KNOW THAT THE GOVERNMENT DIDN'T COMMUNICATE WITH

24 THEM, BUT I DON'T -- I THINK THE IMPORTANT THING IS THAT THEY

25 COMMUNICATE WITH PRETRIAL.  AND PRETRIAL DID COMMUNICATE WITH

8

1  THEM AND CONFIRM THAT MR. WILSON CAN LIVE WITH THEM -- WAS MY

2  READING OF THE REPORT.

3          THE COURT:  YES.  I SEE THAT THEY ATTEMPTED CONTACT,

4  BUT THE GRANDPARENTS REFUSED TO SHARE ANY INFORMATION.

5          MR. SHNEIDER:  THAT WAS WITH THE GOVERNMENT.

6          THE COURT:  OH, OH, I SEE.

7          MR. SHNEIDER:  AND IF YOU -- IF YOU READ ON, I DO

8  BELIEVE PRETRIAL --

9          THE COURT:  OH, I SEE.

10          MR. SHNEIDER:  -- TODAY --

11          THE COURT:  OKAY.

12          MR. SHNEIDER:  I KNOW -- AGAIN, I'M SORRY FOR THE

13  LAST-MINUTE NOTICE OF ALL THIS, BUT THEY DID SPEAK WITH THEM

14  TODAY.

15          THE COURT:  I SEE, YES.

16          OKAY.  ALL RIGHT.  I THINK -- I GUESS THE ONE CONCERN

17  THERE IS THAT, MS. MILSTEIN, YOU APPEAR TO HAVE EMAILS -- I

18  DON'T KNOW IF THEY'VE BEEN SHARED WITH MR. SHNEIDER -- THAT

19  RAISE CONCERNS ABOUT THAT RELATIONSHIP.

20          AND LET ME ASK, MS. MILSTEIN.

21          THE EMAILS THAT ARE REFERENCED IN THE PRETRIAL

22  SERVICES REPORT, I DON'T -- DOES MR. SHNEIDER KNOW ABOUT THOSE?

23          MS. MILSTEIN:  HE DOES.

24          THE COURT:  OKAY.

25          DO YOU WANT TO MAKE A PROFFER?  I MEAN, I DON'T --

9

1  DON'T KNOW WHAT'S IN THE EMAILS.  SO, I DON'T -- IT FEELS ALL

2  VERY OPAQUE ME.

3          MS. MILSTEIN:  YES, YOUR HONOR.

4          AND TO BE CLEAR, MR. SHNEIDER AND I SPOKE THIS

5  MORNING ABOUT THOSE EMAILS, AND THOSE EMAILS WERE PRODUCED TO

6  HIM APPROXIMATELY FIVE -- FOUR OR FIVE MONTHS AGO.

7          AND, SO, YOU KNOW, THE GOVERNMENT HAS A NUMBER OF

8  CONCERNS WITH THE PROPOSED HOUSING SITUATION APART FROM THE

9  DANGER AND RISK OF FLIGHT THAT THE HOUSING SITUATION DOES NOT

10  ADDRESS.

11          BUT I'LL ANSWER THE COURT'S QUESTION DIRECTLY.

12          IT IS, YOU KNOW, ONE EXAMPLE OF AN EMAIL EXCHANGE

13  FROM DECEMBER 4TH, MR. WILSON'S PARTNER MS. DENNINGS REFERENCED

14  AN EMAIL THAT SHE WAS GOING TO GET SOME DOCUMENTS FROM MR.

15  WILSON'S GRANDMOTHER.

16          HE RESPONDED -- I'M GOING TO QUOTE --

17          "PLAIN AND SIMPLY YOU SHOULD HAVE NEVER TOLD MY

18           GRANDMA I WAS HERE" --

19          I ASSUME THAT MEANS MDC --

20          "AND YOU SHOULDN'T KEEP HER INFORMED OF SHIT.  FUCK

21           HER.  I WON'T HAVE ANY RELATIONSHIP WITH HER AFTER

22           THIS.  I DON'T EVER WANT TO SEE OR HEAR FROM HER

23           AGAIN, UNQUOTE.

24          AND, YOU KNOW, WHILE, OF COURSE, YOU KNOW, THIS IS A

25  FAMILY MATTER.  AND IT'S NO ONE'S BUSINESS BUT THE DEFENDANT'S

1    AND HIS FAMILY'S.  THE STABILITY OR INSTABILITY IN THIS CASE OF

2    THAT RELATIONSHIP BEARS ON THE SUCCESS OF DEFENDANT'S, YOU

3    KNOW, PLACEMENT ON BOND, HIS ABILITY TO MAINTAIN AND KEEP WITH

4    THE COURT'S ORDERS -- AND, YOU KNOW, NOT TO MENTION THE

5    GRANDPARENTS' ABILITY TO HELP ENFORCE THE COURT'S ORDERS IF

6    DEFENDANT WERE RELEASED ON BOND.

7            THE GRANDPARENTS ARE NOT PLEDGING ANY MONETARY AMOUNT

8    WHICH MATTERS ONLY BECAUSE THERE IS A SORT OF A LACK OF MORAL

9    SUASION THERE.  SO, IF THE DEFENDANT WERE TO VIOLATE HIS TERMS

10   AND CONDITIONS OF BOND THE GRANDPARENTS, YOU KNOW, SORT OF HAVE

11   NO -- THERE'S NO ENFORCEMENT MECHANISM HERE.

12           AND ADDRESSING THE ISSUE OF CONTACTS WITH THE

13   GRANDPARENTS, THE GRANDPARENTS, YOU KNOW, EXPRESSED AN

14   UNWILLINGNESS TO SHARE ANY INFORMATION WITH THE GOVERNMENT --

15   THAT'S TO SAY, THE U.S. ATTORNEY'S OFFICE, WHICH, YOU KNOW, IS

16   MEANINGFUL TO US IF THE DEFENDANT WERE TO, SAY, VIOLATE OR

17   ABSCOND OR GO TO MEXICO AS HE PREVIOUSLY SAID HE WAS GOING TO.

18           THE GOVERNMENT WOULD LIKELY ASK THE GRANDPARENTS TO

19   COOPERATE IN SOME SORT OF INVESTIGATION AS TO DEFENDANT'S

20   WHEREABOUTS.  BUT IF THE GRANDPARENTS ARE UNWILLING TO

21   COOPERATE ON THE FRONT END WITH ANY INFORMATION AS SIMPLY AS

22   GIVING THEIR DATES OF BIRTHS SO WE CAN VERIFY IF THEY HAVE

23   CRIMINAL HISTORIES OR IF THEY HAVE FIREARMS IN THE HOUSE, WE

24   CANNOT EXPECT THEM TO COOPERATE IN ANY INVESTIGATION IN FINDING

25   THE DEFENDANT SHOULD HE VIOLATE HIS TERMS OF RELEASE.

11

1          AND, SO, THOSE ARE JUST SOME OF THE CONCERNS, BUT I'M

2    HAPPY TO GO INTO MORE OF THEM IF THE COURT WOULD LIKE.

3          THE COURT:  OKAY.

4          ALL RIGHT.  THANK YOU SO MUCH.

5          AND DID YOU GET THOSE EMAILS, MR. SHNEIDER?

6          MR. SHNEIDER:  YES, YOUR HONOR.

7          AS MS. MILSTEIN SAID, WHAT HAPPENED WAS THERE WAS

8    SORT OF A DISCOVERY DUMP OF CORRLINKS EMAIL COMMUNICATIONS FROM

9    MR. WILSON TO MOSTLY HIS GIRLFRIEND.  AND I DO HAVE THOSE.

10         I DIDN'T KNOW THE SPECIFIC EMAIL ITSELF.  I DID SPEAK

11   GENERALLY WITH MS. MILSTEIN, BUT THAT EMAIL MAKES SENSE TO ME.

12         IF I MAY, I CAN RESPOND TO SOME OF THOSE CONCERNS,

13   INCLUDING THAT EMAIL AND THE OTHER CONCERNS THE GOVERNMENT

14   RAISED.  OR IF YOUR HONOR HAS OTHER THINGS YOU'D LIKE TO FOCUS

15   ON, HOWEVER YOU WANT TO PROCEED.

16         THE COURT:  WELL, I GUESS -- YOU KNOW, AND I'M

17   MINDFUL THAT YOU HAVE SOMEPLACE TO BE.  AND I NEVER -- I NEVER

18   WANT TO -- WELL, I WANT TO BE AS EFFICIENT AS POSSIBLE.

19         I GUESS THE OTHER NEW INFORMATION THAT I THINK

20   LOOKING AT THE TIMELINE HAS HAPPENED SINCE YOU WERE LAST IN

21   FRONT OF ME WAS THE WARRANT THAT'S BEEN ISSUED BY ORANGE COUNTY

22   IN CONNECTION WITH THE ARSON.

23         MY RECOLLECTION IS THAT WE KNEW ABOUT THAT INCIDENT,

24   BUT I THINK BECAUSE IT WAS IN THE COMPLAINT -- IF MY

25   RECOLLECTION IS CORRECT.  AND, SO, AN ADDITIONAL PIECE OF

12

1  INFORMATION THERE FOR ME IS THAT ORANGE COUNTY HAS AT LEAST

2  DONE SOMETHING WITH THAT -- HAS ISSUED OR HAS PAPERED IT.  AND

3  SO NOW THERE'S A WARRANT FOR HIS ARREST IN CONNECTION WITH THAT

4  ARSON.

5          THE ONLY INFORMATION THERE THOUGH IS IN A PREVIOUS

6  REPORT.  I JUST WANT TO CONFIRM THAT THAT IS, IN FACT,

7  SOMETHING THAT'S NEW, THAT'S HAPPENED SINCE THE LAST TIME

8  CERTAINLY YOU WERE IN FRONT OF ME.  MAYBE NOT WHEN YOU WERE IN

9  FRONT OF THE DISTRICT JUDGE.

10          MR. SHNEIDER:  THAT'S ALL CORRECT.  I THINK IT HAD

11  BEEN INDICTED -- OR AN INFORMATION, HOWEVER IT WAS DONE IN

12  ORANGE COUNTY BY THE TIME WE WENT IN FRONT OF DISTRICT JUDGE

13  OLGUIN.

14          BUT YOU ARE CORRECT THAT THAT WASN'T THE CASE WHEN WE

15  WERE LAST IN FRONT OF YOUR HONOR.

16          TO THAT I'LL SAY -- I THINK I DID REFERENCE IN THE

17  PAPER FILINGS THAT -- AND CROSS-REFERENCING OLDER FILINGS, THAT

18  IT'S OUR POSITION THAT THAT CASE WILL NOT IN THE END STICK

19  AGAINST MR. WILSON FOR A VARIETY OF REASONS BEING THAT IT WAS A

20  SHARED CAR.  HIS PROPERTY WAS IN THE CAR.  NO ONE SAW HIM LIGHT

21  THAT CAR ON FIRE.  AND SOME OTHER FACTORS AS WELL.

22          IN TERMS OF ACTUAL RELEASE STATUS, MR. WILSON WITH

23  ANDREA DENNINGS, HIS GIRLFRIEND, HAVE WORKED TO -- MY

24  UNDERSTANDING IS ALREADY PAY OFF THAT BOND AMOUNT IN ORANGE

25  COUNTY SUCH THAT IF HE WERE GRANTED BAIL HERE, I DON'T THINK HE

13

1   WOULD EVEN BE TRANSFERRED THERE BECAUSE I THINK THAT BOND HAS

2   BEEN SATISFIED.  I COULD BE INCORRECT ON THAT, BUT THAT'S MY

3   UNDERSTANDING.

4          AND THEN IF IT HAS BEEN SATISFIED, I THINK HE WOULD

5   EITHER BE RELEASED FROM HERE, OR HE MIGHT GET TRANSFERRED TO

6   ORANGE COUNTY AND THEN RELEASED.  BUT I DO BELIEVE -- THERE WAS

7   A BOND AMOUNT.  I FORGET EXACTLY HOW MUCH IT WAS, BUT IT WAS ON

8   THE WARRANT.  AND THAT AMOUNT HAS BEEN PAID THROUGH A BONDS

9   PERSON FROM WHAT I UNDERSTAND.

10          THE COURT:  OKAY.

11          THE DEFENDANT:  YES.

12          MR. SHNEIDER:  THAT'S FINE.

13          THE COURT:  OKAY.

14          MR. SHNEIDER:  I THINK HE'S JUST CONFIRMING THAT --

15          THE COURT:  OKAY.

16          MR. SHNEIDER:  -- THAT IS CORRECT.

17          THE COURT:  OKAY.

18          ALL RIGHT.  SO, THANK YOU AGAIN.

19          JUST -- I JUST WANTED TO MAKE SURE THAT I HAVE ALL OF

20   THE FACTS.

21          SO, NOW, MR. SHNEIDER, I DIDN'T MEAN TO DERAIL YOUR

22   ARGUMENT AND YOUR PRESENTATION TO THE COURT.

23          I WILL IF YOU WOULD LIKE TO PROCEED WITH ANY ARGUMENT

24   YOU HAD ANTICIPATED MAKING.

25          PLEASE.

14

1           MR. SHNEIDER:  SURE.  THANK YOU.

2           IN TERMS OF -- I DO WANT TO FIRST ADDRESS WHAT MS.

3    MILSTEIN BROUGHT UP IN TERMS OF THE GRANDPARENTS' WILLINGNESS

4    TO COOPERATE AND OTHER CONCERNS WITH THAT RESIDENCE.

5           AND I -- ONE OF THE REASONS WHY IS BECAUSE I THINK

6    THE MAIN THING THAT HAS CHANGED FROM WHAT WE ASKED BEFORE IS,

7    ONE, IS THE SURETY SITUATION AND, TWO, IS THE LIVING SITUATION.

8           SO, I'LL START WITH THE LIVING SITUATION.

9           THIS EMAIL SENT FROM DECEMBER 4TH, 2020 EXPRESSING

10   FRUSTRATION AND ANGER WITH MR. WILSON'S GRANDMOTHER STEMS

11   DIRECTLY FROM THE FACT THAT AT THAT POINT IN TIME HER AND HER

12   HUSBAND BRUCE, HIS GRANDFATHER -- MR. WILSON'S GRANDFATHER WERE

13   UNWILLING TO SERVE AS SURETIES OR REALLY TO HELP IN ANY WAY,

14   SHAPE OR FORM.

15          THESE ARE FOR ALL INTENTS AND PURPOSES MR. WILSON'S

16   PARENTS.  THEY RAISED HIM.  HE LIVED WITH THEM THE VAST

17   MAJORITY OF HIS LIFE.  AND HE VIEWS THEM AS HIS PARENTS.

18          SO, HE WAS SPEAKING UNDER A SITUATION WHERE BASICALLY

19   HIS PARENTS HE FELT HAD ABANDONED HIM.

20          I KNOW THIS IS A LOT OF EXTRANEOUS RECORD INFORMATION

21   I'M PROVIDING, BUT THAT EMAIL NEEDS TO BE PUT IN CONTEXT.  AND

22   THAT'S WHAT THAT EMAIL WAS ABOUT.  AND THAT EMAIL WAS FROM OVER

23   SIX MONTHS AGO I THINK AT THE HEIGHT OF THE OUTBREAK AT MDC OF

24   CORONA VIRUS.  IT WAS A VERY DIFFICULT TIME FOR MR. WILSON.

25          SINCE THAT TIME MR. WILSON HAS FOUND HIMSELF IN A

15

1    COMPLETELY DIFFERENT HEADSPACE THAN HE WAS THEN.

2         HE HAS A NEWBORN SON WITH MS. DENNINGS NOW.  AND ALSO

3    HE HAS MADE AMENDS WITH HIS GRANDPARENTS.

4         AND I SPOKE WITH THEM.  THEY SPOKE WITH PRETRIAL

5    SERVICES.  THEY ARE WILLING TO LET HIM LIVE WITH THEM.  AND MR.

6    WILSON IS WILLING TO LIVE WITH THEM AS WELL.

7         I BELIEVE THEY WILL PROVIDE THE MOST STABLE RESIDENCE

8    AS HE HAS LIVED MOST OF HIS LIFE WITH THEM, ESPECIALLY HIS

9    YOUTH, HIS CHILDHOOD.  THEY SERVED AS PARENTS TO HIM.  THEY

10   LIVE ALONE IN A -- IN A -- IT SOUNDS LIKE A THREE-BEDROOM HOUSE

11   IN RIVERSIDE -- I MEAN, EXCUSE ME -- OCEANSIDE, CALIFORNIA.

12        AND BRUCE, THE GRANDFATHER, WAS IN THE NAVY FOR

13   ALMOST 22 YEARS.  I KNOW THAT'S NOT IN THE REPORT, BUT THAT'S

14   MY UNDERSTANDING.  AND HE WORKS.  AND THE GRANDMOTHER, AGAIN,

15   HAS BEEN LIKE A MOTHER TO MR. WILSON.  SO, I ACTUALLY THINK

16   THAT THAT IS THE MOST STABLE RESIDENCE AND THE BEST PLACE FOR

17   HIM TO LIVE.

18        THE LAST TIME WE WERE HERE I PROPOSED MR. WILSON

19   LIVING WITH HIS GIRLFRIEND MS. DENNINGS.

20        AND THE GOVERNMENT AND THE COURT BOTH AND JUDGE

21   OLGUIN AS WELL ALL WERE NOT COMFORTABLE WITH THAT.  AND I

22   UNDERSTAND ALL THE REASONS WHY.  I'M NOT PROPOSING THAT

23   ANYMORE.  I'M PROPOSING A MUCH STABLER RESIDENCE AND ONE THAT

24   WOULD NOT CREATE THE POTENTIAL I GUESS CONFLICT OR RISK OF

25   ABSCONDING THAT MS. DENNINGS MIGHT CREATE IN THE GOVERNMENT'S

16

1    VIEW OR IN THE COURT'S VIEW.

2           SO, I THINK THE RESIDENCE ACTUALLY IS A BIG JUMP

3    FORWARD IN TERMS OF STABILITY AND A BIG REDUCTION IN TERMS OF

4    RISK OF NONAPPEARANCE AND DANGER TO THE COMMUNITY.

5           IN TERMS OF THE BAIL RESOURCES, ALSO YOUR HONOR AND

6    JUDGE OLGUIN BOTH FOUND MS. DENNINGS TO BE NOT A VIABLE BAIL

7    RESOURCE.

8           SO, EVEN THOUGH I -- WE HAD PUT FORWARD 20,000 IN

9    UNSECURED SURETIES BEFORE.  IT REALLY IN REALITY WAS 10 BECAUSE

10   BOTH YOU AND JUDGE OLGUIN DISREGARDED MS. DENNINGS.

11          NOW, WE'RE PUTTING FORWARD THE SAME 10,000 FROM MR.

12   AGUIRRE, A FRIEND WHO PRETRIAL AGAIN CONFIRMED IS WILLING TO

13   SIGN AND SO DID I CONFIRM WITH HIM.

14          ALSO, $5,000 IN CASH TO BE DEPOSITED WITH THE CLERK

15   OF THE COURT WHICH IS COMING FROM TAX REFUND MONEY AND COVID

16   RELIEF MONEY RECEIVED BY BOTH MR. WILSON AND MS. DENNINGS --

17   WHICH IS, FRANKLY, ALL OF THEIR SAVINGS RIGHT NOW.  THAT IS A

18   LOT OF MONEY ON THE LINE FOR MR. WILSON.  IT IS NOT

19   INSIGNIFICANT.  AND IT'S REAL MONEY.  THIS IS COLD HARD CASH

20   THAT WOULD BE DEPOSITED WITH THE CLERK OF THE COURT THAT WOULD

21   BE HANGING OVER HIM THE WHOLE TIME HE'S OUT.  AND HE WOULD LOSE

22   IT INSTANTLY -- MAYBE NOT INSTANTLY -- SORRY.  THERE WOULD BE

23   LITIGATION ABOUT IT, BUT HE WOULD PRESUMABLY LOSE IT IF HE

24   VIOLATES THE TERMS OF PRETRIAL RELEASE.  AND HE KNOWS THIS.

25          SO, I KNOW THERE'S DISCUSSION OF MORAL SUASION FROM

17

1  THE GRANDPARENTS.  AND IT'S TRUE.  THEY'RE NOT WILLING TO SIGN

2  FOR "THEM" BECAUSE THEY -- THEY ARE NOT IN A POSITION TO DO

3  THAT RIGHT NOW.  BUT THEY ARE WILLING TO DO SOMETHING THAT IS

4  EQUALLY, IF NOT MORE IMPORTANT, WHICH IS LET HIM LIVE WITH THEM

5  AND LOOK AFTER HIM AND BE THERE FOR HIM.

6         SO, WE THINK IT'S A MUCH BETTER SITUATION THAN IT WAS

7  BACK LAST YEAR WHEN WE ASKED FOR BOND.  AND EVEN EARLIER THIS

8  YEAR WHEN WE ASKED FOR BOND IN FRONT OF JUDGE OLGUIN.

9         I WILL SAY THAT JUDGE OLG- -- THIS I DON'T THINK

10  NECESSARILY MATTERS IN YOUR ANALYSIS BECAUSE THIS IS JUDGE

11  OLGUIN AND NOT YOUR HONOR.

12         BUT JUDGE OLGUIN DID STATE ON THE RECORD AT THE

13  REVIEW HEARING WITH HIM THAT HE THOUGHT CONDITIONS COULD BE

14  IMPOSED.  AND HE LIKE YOUR HONOR WAS UNCOMFORTABLE WITH THE

15  LIVING SITUATION THAT WE PROPOSED.  AGAIN, THAT'S DIFFERENT

16  NOW.

17         AND, AGAIN, WE THINK THIS IS THE MOST SOLID AND

18  STABLE RESIDENCE HE POSSIBLY COULD -- COULD BE AT BECAUSE HE

19  DOESN'T HAVE MORE FAMILY THAN HIS GRANDPARENTS.

20         IN TERMS OF THE OTHER ISSUES, I JUST WANT TO REMIND

21  THE COURT OF THE RELEVANT STANDARDS HERE AND ARGUE THAT MR.

22  WILSON -- I'M SORRY, THE GOVERNMENT RATHER CANNOT SHOW BY A

23  PREPONDERANCE OF THE EVIDENCE THAT NO COMBINATION OF CONDITIONS

24  WILL REASONABLY ASSURE MR. WILSON'S APPEARANCE.

25         HE'S LIVED IN OTHER PLACES, BUT HE'S LIVED THE

18

1    MAJORITY OF HIS LIFE IN SOUTHERN CALIFORNIA -- A LOT OF IT IN

2    THE SAN DIEGO AREA WHICH HE WOULD BE RETURNING TO IF HE'S

3    RELEASED.  BUT STILL HE HAS STRONG TIES HERE.  HIS NEWBORN SON

4    IS IN THE IRVINE AREA IN HUNTINGTON BEACH, I BELIEVE.  AND HIS

5    GRANDPARENTS ARE IN OCEANSIDE WHERE HE WOULD STAY.

6            HE WOULD BE ON LOCATION MONITORING FROM WHAT WE'RE

7    PROPOSING.

8            I WILL SAY THAT OUR PROPOSITION IS FOR HIM TO BE ON

9    LOCATION MONITORING WITHOUT RESIDENTIAL RESTRICTIONS.  AND THE

10   REASON WHY IS BECAUSE AFTER SPEAKING WITH HIS GRANDPARENTS, HIS

11   GRANDFATHER IS OUT OF THE HOUSE WORKING MONDAY THROUGH FRIDAY.

12   I BELIEVE HE WORKS IN SOME SORT OF SECURITY SECTOR JOB.  AND

13   HIS GRANDMOTHER DOESN'T WORK BUT SHE DOES LEAVE THE HOUSE WITH

14   SOME FREQUENCY TO RUN ERRANDS AROUND TOWN OR DO OTHER THINGS

15   AROUND TOWN.  AND BOTH THE GRANDPARENTS SAID WE WANT NATHAN

16   WITH US A HUNDRED PERCENT OF THE TIME.  SORRY, MR. WILSON WITH

17   US A HUNDRED PERCENT OF THE TIME.

18           SO, MS. JAMES SAID, LOOK, IF I GO OUT AND I HAVE TO

19   RUN AN ERRAND, I WANT MR. WILSON WITH ME.  I DON'T WANT HIM IN

20   THE HOUSE BY HIMSELF.  AND HE WILL BE WITH ME.

21           AND I DO BELIEVE FROM SPEAKING WITH THEM AND FROM

22   SPEAKING WITH MR. WILSON, THAT THEY ARE STRICT.  THEY'RE PEOPLE

23   WHO WOULD BE ON MR. WILSON, WHO WOULD NOT LEAVE HIM TO HIS OWN

24   DEVICES.

25           BUT THE LOCATION MONITORING WOULD ALLOW PRETRIAL TO

1  KNOW WHERE HE IS AT ALL TIMES.  AND IF HE EVER DEVIATES FROM

2  OCEANSIDE THEY WOULD KNOW RIGHT AWAY.

3          AND MS. WILSON -- I MEAN, SORRY -- MS. MILSTEIN MADE

4  A REFERENCE TO THE NOTION THAT THEY COULDN'T TRUST -- THE

5  GOVERNMENT CAN'T TRUST THE GRANDPARENTS IF SOMETHING SHOULD

6  HAPPEN AND MR. WILSON ABSCONDS.  BOTH THE GRANDPARENTS

7  EXPRESSED TO ME THAT IF HE TAKES OFF AND ABSCONDS, THEY'RE

8  HAPPY TO HELP HIM GET LOCKED UP AGAIN.  THEY ASKED ME NUMEROUS

9  TIMES WHAT WOULD HAPPEN IF HE DOESN'T FOLLOW THE RULES.  AND I

10  TOLD THEM HE'LL BE BACK IN JAIL.  AND THEY ARE QUITE CONTENT

11  WITH THAT.  THEY THINK THAT THIS TIME SITTING OUT IN CUSTODY

12  HAS DONE MR. WILSON SOME GOOD.  AND IT MAY HAVE BECAUSE HE IS

13  IN A MUCH DIFFERENT HEADSPACE THAN HE WAS WHEN HE WAS INITIALLY

14  PICKED UP.

15          AND, SO, I DON'T THINK -- I UNDERSTAND THAT THERE'S

16  ALLEGATIONS THAT HE MIGHT GO TO MEXICO.  BUT THAT'S BASED ON AN

17  EMAIL OR TWO I THINK BUT NO CONCRETE EVIDENCE THAT HE HAS THE

18  ABILITY TO DO THAT.  HE WOULD SURRENDER HIS PASSPORT.  AND HE

19  WOULD BE ON LOCATION MONITORING.  AND I DON'T THINK -- I THINK

20  THERE ARE PLENTY OF MEASURES THAT COULD BE IMPOSED FOR

21  CONDITIONS OF RELEASE TO MITIGATE AGAINST THAT RISK.

22          AND THEN IN TERMS OF THE OTHER MAJOR QUERY HERE THE

23  GOVERNMENT CANNOT SHOW WITH CLEAR AND CONVINCING EVIDENCE THAT

24  NO COMBINATION OF CONDITIONS CAN ASSURE -- REASONABLY ASSURE

25  THE SAFETY OF THE COMMUNITY.

1          MR. WILSON HAS ONE PRIOR CONVICTION FOR A DUI

2    MISDEMEANOR FOR WHICH HE SPENT EIGHT DAYS IN JAIL IN WASHINGTON

3    STATE.  THIS BY FAR IS THE HEAVIEST INTERACTION WITH THE SYSTEM

4    HE'S EVER HAD.  HE'S BEEN IN JAIL TEN TIMES LONGER THAN HE EVER

5    HAS BEFORE -- MORE THAN THAT.  I'M SORRY.  MATH IS NOT MY

6    STRONG SUIT.  BUT HE'S BEEN IN CUSTODY A LONG TIME, ALMOST

7    EIGHT -- ABOUT EIGHT MONTHS NOW I THINK -- WHEN BEFORE IT WAS

8    EIGHT DAYS.

9          HE HAS ONE PRIOR DUI AND NOTHING ELSE.

10          IF -- THERE'S A DECENT CHANCE THIS CASE WILL GO TO

11    TRIAL.  I DON'T KNOW YET FOR SURE, BUT WE ARE SET FOR TRIAL IN

12    MID-SEPTEMBER.  AND THERE ARE TRIABLE ISSUES FROM OUR

13    PERSPECTIVE.

14          BUT REGARDLESS THE FACT REMAINS THAT THE WEIGHT OF

15    THE EVIDENCE IS THE LEAST IMPORTANT FACTOR.  AND THIS CASE

16    ALONE DOES NOT ESTABLISH DANGEROUSNESS SUCH THAT DETENTION IS

17    MERITED.

18          AND, SO, THE GOVERNMENT CANNOT MEET ITS BURDEN BY

19    CLEAR AND CONVINCING EVIDENCE THAT THERE ARE NO CONDITIONS THAT

20    COULD ASSURE THE SAFETY OF THE COMMUNITY.

21          SO, FOR ALL THOSE REASONS WHEN YOU PUT IT

22    ALL TOGETHER, AGAIN, THIS IS THE MOST STABLE RESIDENCE HE HAS

23    TO OFFER.  AND $5,000 IN MONEY DEPOSITED WITH THE CLERK OF THE

24    COURT IS AS MUCH MORAL SUASION AS ANY PERSON NEEDS, ESPECIALLY

25    WHEN THEY HAVE A NEWBORN CHILD.

1          AND, SO, THAT WITH LOCATION MONITORING, WE WOULD ASK

2     FOR A MENTAL HEALTH EVALUATION AND TREATMENT IF NECESSARY, THAT

3     HE SEEK OUT WORK AND WORK IF HE CAN.

4          AND ON THAT POINT I WILL MENTION THAT IN OCEANSIDE

5     THERE IS A LEGOLAND FACILITY WHERE HE WORKED FOR SEVERAL YEARS.

6     THAT'S NOTED IN ONE OF THE PREVIOUS PRETRIAL REPORTS.  BUT WHEN

7     HE LEFT LEGOLAND HE WAS TOLD HE WAS ALWAYS WELCOME BACK TO WORK

8     THERE.  AND HE'S PRETTY CONFIDENT HE COULD GO BACK TO WORK AT

9     LEGOLAND IN THE OCEANSIDE OR SAN DIEGO AREA.

10          THE COURT:  AT LEGOLAND?

11          MR. SHNEIDER:  AT LEGOLAND, YEAH.

12          I UNDERSTAND THAT MIGHT SOUND LIKE A JOB FOR A CHILD,

13     BUT HE DID IT AS AN ADULT.  I'M NOT SURE EXACTLY --

14          THE COURT:  NO, NO.  IT DOESN'T SOUND LIKE A JOB FOR

15     A --

16          MR. SHNEIDER:  THE --

17          THE COURT:  -- CHILD.  IT JUST SOUNDS LIKE A JOB WHERE

18     YOU'RE AROUND CHILDREN.

19          MR. SHNEIDER:  I DON'T THINK THERE ARE ANY CONCERNS

20     FOR --

21          THE COURT:  NO, NO.  I JUST -- I'LL TELL YOU -- YOU

22     KNOW, I GUESS -- YOU KNOW, I'M -- I DON'T -- I HAVEN'T MADE UP

23     MY MIND.

24          I SEE TWO -- I DO GIVE A HARD LOOK TO THE FACT THAT

25     IT'S ONLY ONE MISDEMEANOR CONVICTION HERE, WHICH I MEAN AS WE

22

1    KNOW THAT'S ALMOST RARE TO SEE AT THIS LEVEL.  BUT THEN I SEE

2    TWO INSTANCES INVOLVING FIRE.

3              I DON'T KNOW WHAT'S GOING TO HAPPEN WITH IRVINE.  I

4    MEAN, I DON'T THINK THE LAW PERMITS YOU TO JUST SET FIRE TO

5    YOUR OWN POSSESSIONS.  I'M CONCERNED ABOUT THAT.  THAT'S

6    REALLY, REALLY TROUBLING TO ME.  AND I DON'T KNOW WHAT

7    INFERENCE TO TAKE FROM THE GRANDPARENTS' RELUCTANCE TO PROVIDE

8    ANY OF THEIR INFORMATION.

9              IT SHOWS SOME RETICENCE -- I'M NOT SAYING THAT

10   THEY'RE HIDING ANYTHING.  LOOK, I DON'T THINK -- THEY SOUND

11   LIKE GOOD PEOPLE, LAW-ABIDING PEOPLE.  BUT I DON'T KNOW WHAT

12   INFERENCE TO TAKE FROM THEIR RETICENCE TO BE FORTHCOMING IN

13   SHARING PRETTY BASIC INFORMATION.

14             MR. SHNEIDER:  I COULD SHED -- SORRY TO INTERRUPT YOU

15   --

16             THE COURT:  NO.  THAT'S OKAY.

17             GO AHEAD, MR. SHNEIDER.

18             MR. SHNEIDER:  -- I CAN SHED SOME LIGHT ON THAT.

19             WHEN THEY ADOPTED MR. WILSON WHEN HE WAS AROUND 5 TO

20   6 YEARS OLD THEY -- AS DESCRIBED TO ME BY THEM WENT THROUGH THE

21   RINGER IN TERMS OF GOVERNMENT ATTORNEYS REALLY DIGGING INTO

22   THEIR -- ALL ASPECTS OF THEIR LIFE.  THEY'RE OLDER.  I THINK

23   MR. WILSON'S GRANDMA IS IN HER LATE 50'S.  MR. JAMES IS IN HIS

24   EARLY 60'S.  THEY DON'T WANT THE GOVERNMENT INTERFERING WITH

25   THEM IN ANY WAY, SHAPE OR FORM.

1          I UNDERSTAND WHERE YOUR HONOR IS COMING FROM AND

2   WHERE THE GOVERNMENT IS COMING FROM.  BUT THEY WERE HAPPY TO

3   SPEAK WITH PRETRIAL.  THEY JUST DON'T WANT TO SPEAK WITH THE

4   UNITED STATES ATTORNEY, WHICH I -- I DON'T BLAME THEM.

5          THE COURT:  WELL, I DON'T THINK THEY WERE HAPPY TO

6   TALK TO PRETRIAL BECAUSE THEY REFUSED TO SHARE ANY INFORMATION

7   FOR BACKGROUND INFORMATION AS PRETRIAL.  THAT'S WITH PRETRIAL.

8          MR. SHNEIDER:  WHERE DOES IT -- SORRY.  LET ME --

9          THE COURT:  SO, IT DOESN'T -- IT DOESN'T HAVE A PAGE.

10  IT'S JUST ON THE -- YOU KNOW WHEN YOU FLIP TO THE SECOND PAGE.

11  SO, AFTER YOU GET PAST THE FACE SHEET.

12         AND IT SAYS, "ON THIS DATE THE AUSA" -- OH, I

13  APOLOGIZE.  YOU KNOW WHAT, I KEEP MISREADING THAT, MR.

14  SHNEIDER.  I DON'T KNOW WHY.  I THINK I HAVE IN MY MIND'S EYE

15  THAT IT -- IT'S IN A DIFFERENT SECTION.

16         I GUESS -- SO, I'LL DELETE THAT.  THAT IS -- THAT IS

17  INCORRECT.  BUT I STILL REMAIN SO TROUBLED BY SETTING THESE

18  FIRES.  AND I KNOW THAT IT'S -- WELL, I GUESS IT IS DIFFERENT

19  FOR ME NOW.  BEFORE IT WAS ALWAYS OUT THERE.  IT WAS DESCRIBED

20  IN THE COMPLAINT AFFIDAVIT IN SOME DETAIL.  AND NOW IRVINE HAS

21  DECIDED TO GO FORWARD ON IT.

22         AND I GUESS, YOU KNOW, ON THE $5,000, I DON'T KNOW IF

23  THIS IS MORE OF A -- I'M NOT SURE IF -- IT'S NOT MORAL OR

24  ETHICAL, BUT THIS IS -- IF IT'S UNEMPLOYMENT MONEY OR

25  COVID-RELATED MONEY, I'M JUST NOT SURE THAT THE IDEA OF IT

24

1    GOING -- ESPECIALLY WHEN SOMEONE HAS A NEWBORN AT HOME, RIGHT,

2    IT'S GOING TO GO AND BECOME SOMEONE'S BOND MONEY.  I MEAN, I'M

3    NOT SURE -- I DON'T THINK THERE ARE ANY LIMITS ON -- YOU KNOW,

4    IT'S NOT LIKE IT'S CHILD SUPPORT MONEY THAT'S BEING REDIRECTED

5    OR SOCIAL SECURITY DISABILITY.  BUT JUST THE IDEA THAT THAT CAN

6    THEN BE REDIRECTED TO HELP SOMEBODY POST BOND, AGAIN, MAYBE

7    THAT'S -- YOU'LL TELL ME THAT THAT'S AN INTELLECTUALLY

8    INAPPROPRIATE WAY TO THINK ABOUT THE MONEY.  THE COURT DOESN'T

9    LOOK AT WHERE THE MONEY COMES FROM.  IT'S JUST MONEY THAT'S

10   AVAILABLE.

11        IT SEEMS TO ME LIKE A NEW MOM WITH A NEWBORN WOULD

12   LIKE TO HAVE THAT MONEY AVAILABLE TO HER.  SO, I GUESS THE

13   INFERENCE IS THAT'S HOW MUCH SHE'S -- HOW MUCH CONFIDENCE SHE

14   HAS IN MR. WILSON THAT HE'S GOING TO ABIDE BY HIS RELEASE

15   CONDITIONS AND NOT TAKE OFF AND FORFEIT WHAT'S A PRETTY GOOD

16   CHUNK OF CHANGE.

17        BUT I GUESS -- SO, THOSE ARE MY -- MY -- WHAT

18   TROUBLES ME.  AND EVEN IF -- MAYBE -- YOU KNOW, CASH IS ALSO

19   UNUSUAL.  I DON'T THINK THAT THAT WOULD HANG IN THE BALANCE ON

20   CASH.

21        LET ME HEAR FROM MS. MILSTEIN.

22        MS. MILSTEIN:  THANK YOU, YOUR HONOR.

23        I WILL ADDRESS BRIEFLY THE POINTS THAT THE GOVERNMENT

24   IS HUNG UP ON IN ADDITION TO THE APPARENT INSTABILITY OR AT

25   LEAST TUMULTUOUSNESS OF THE RELATIONSHIP BETWEEN THE DEFENDANT

25

1  AND HIS PROPOSED HOUSING SITUATION, WHICH AS STATED BEFORE

2  GIVES THE GOVERNMENT A LOT OF CONCERN ABOUT ITS POTENTIAL FOR

3  SUCCESS.

4            THE BOND TERMS DO NOT ADDRESS THE GOVERNMENT'S

5  CONCERN WITH DANGER AND DO NOT ADDRESS THE GOVERNMENT'S CONCERN

6  WITH RISK OF NONAPPEARANCE.

7            NOTHING IN THE NEW PROPOSAL NEGATES THE DEFENDANT'S

8  STATEMENTS THAT HE WANTED TO BRING HIS NOW BORN CHILD TO

9  MEXICO.  NOTHING IN THIS NEW PROPOSAL ADDRESSES THE DEFENDANT

10  HAVING TWICE BURNED CARS, ONE OF WHICH WAS HIS PARTNER'S CAR

11  THAT THE COURT ALLUDED TO.  AND ONE OF WHICH WAS A POLICE CAR

12  FOR WHICH HE WAS APPARENTLY CHARGED.

13            AND NOTHING IN THE NEW PROPOSAL ADDRESSES HIS SOCIAL

14  MEDIA POSTS WITH AR-STYLE RIFLES AND HIS SAYING THAT HE WANTS

15  TO USE THOSE GUNS TO HURT PEOPLE -- THREATS THAT WERE SERIOUS

16  THAT THE FBI ASSIGNED HIM A GUARDIAN AND PAID HIM A VISIT OR

17  COMMUNICATED WITH HIM ABOUT THEM.

18            THOSE STATEMENTS WERE, YOU KNOW, A NUMBER OF YEARS

19  AGO AND ALSO EARLY -- EARLY LAST YEAR.

20            AND, SO, WE HAVE BOTH RECENT AND SERIOUS CONDUCT THAT

21  GIVES THE GOVERNMENT CONCERN NOT JUST THAT THE DEFENDANT BURNS

22  CARS AND THAT IT WASN'T JUST A ONE-OFF OCCURRENCE, BUT THAT HE

23  HAS ACCESS TO AND INCLINATION TO USE SERIOUS FIREARMS.

24            AND, SO, THE GOVERNMENT'S PRIMARY CONCERN IS DANGER

25  TO THE COMMUNITY AND ALSO RISK OF NONAPPEARANCE AFFECTING -- IT

26

1    GOES TO THE DEFENDANT'S DOMESTIC PARTNER OR HIS PARTNER RATHER.

2    AND IT GOES TO THE COMMUNITY AT LARGE.

3          AND -- BUT EVEN IF WE CABIN THE DEFENDANT'S

4    DANGEROUSNESS FOR A MOMENT -- AND I'M NOT SUGGESTING THAT WE DO

5    CABIN IT -- BUT EVEN IF WE DO JUST FOR THE SAKE OF ARGUMENT,

6    THE GOVERNMENT STILL HAS SOME DISTINCT CONCERNS ABOUT THE

7    DEFENDANT'S INADEQUATE HOUSING PLACEMENT.

8          YOU KNOW, AS THE COURT -- AS THE GOVERNMENT SAID

9    BEFORE THE GRANDPARENTS WERE NOT FORTHCOMING ABOUT BASIC

10   INFORMATION.  AND, SO, WHILE THE DEFENDANT IF -- IF MR. WILSON,

11   YOU KNOW, DOES ABSCOND OR VIOLATES THE TERMS, THE GRANDPARENTS

12   WILL BE HAPPY TO SEE HIM IN PRISON.  BUT THERE'S NO TELLING WHO

13   WILL ACTUALLY COOPERATE WITH THE GOVERNMENT'S INVESTIGATION

14   INTO THE DEFENDANT.  THAT'S STILL -- IT REMAINS CLEAR AT LEAST

15   FROM MY PERSPECTIVE THAT THEY'LL BE AS COOPERATIVE IN THAT

16   INVESTIGATION AS THEY WERE IN TRYING TO VERIFY IF THEY HAD

17   CRIMINAL HISTORIES OR FIREARMS IN THE HOUSE.

18         AND THE GRANDPARENTS AS I NOTED BEFORE ARE NOT

19   SURETIES.  AND, SO, THEY HAVE REALLY NOTHING ON THE LINE IN

20   TERMS OF REQUIRING THE DEFENDANT TO COMPLY WITH HIS TERMS OF

21   BOND.

22         AND YOU KNOW -- NOR DOES THE DEFENDANT APPEAR TO HAVE

23   THAT SORT OF STABLE RELATIONSHIP WITH THEM SUCH THAT HE WOULD,

24   YOU KNOW, FEEL BAD OR GUILTY OR, YOU KNOW, FEEL THE NEED TO

25   COMPLY WITH HIS BOND TERMS FOR THEIR SAKE.

27

1          AND, SO, YOU KNOW, BECAUSE OF THE TUMULTUOUSNESS OF

2     THAT RELATIONSHIP, THE INSTABILITY OF THAT RELATIONSHIP, HIS TO

3     ME PROVEN DANGEROUSNESS TO NOT JUST HIS FAMILY BUT ALSO THE

4     COMMUNITY AT LARGE, THE GOVERNMENT BELIEVES THAT THE DEFENDANT

5     SHOULD REMAIN DETAINED PENDING TRIAL.

6          (PAUSE IN PROCEEDINGS.)

7          THE COURT:  ALL RIGHT.

8          MR. SHNEIDER, YOUR RESPONSE.

9          MR. SHNEIDER:  YES, YOUR HONOR.

10         FIRST TO RESPOND TO SOME OF THE THINGS THE COURT

11    HIGHLIGHTED.

12         THE IRVINE CASE AND THIS CASE ARE BOTH IN A POSTURE

13    WHERE MR. WILSON IS PRESUMED INNOCENT.

14         I UNDERSTAND THAT THERE ARE THESE ALLEGATIONS AGAINST

15    HIM, BUT THAT'S THE POSTURE WE'RE IN.  AND UNLESS AND UNTIL

16    THAT CHANGES, I DON'T THINK THAT ALONE ESTABLISHES BY CLEAR AND

17    CONVINCING EVIDENCE THAT HE'S A DANGER.

18         THE COURT:  WHAT ABOUT THE SIMILARITY, THOUGH? --

19    RIGHT.

20         MR. SHNEIDER:  THERE -- YOU KNOW, I CAN -- IF YOUR

21    HONOR IS ON THE FENCE WE CAN PROVIDE -- ALTHOUGH I THINK THE

22    GOVERNMENT PROVIDED POLICE REPORTS IN PREVIOUS FILINGS.  BUT

23    THEY'RE NOT ALL THAT SIMILAR FROM OUR PERSPECTIVE.

24         IN ONE CASE THERE WAS A CAR WHERE IT WAS ABANDONED.

25    AND WHEN IT WAS FOUND IT WAS ON FIRE, BUT IT WAS NOT A

1   SITUATION WHERE ANYONE SAW WHAT HAPPENED.  AND IT WAS NOT A

2   SITUATION WHERE THERE WAS DAMAGE TO SOME EXTRANEOUS PERSON'S

3   PROPERTY.

4        AND I'M NOT -- I DON'T KNOW ACTUALLY BECAUSE I'VE

5   NEVER TRIED A STATE ARSON CASE IF IT IS A DEFENSE THAT IF IT'S

6   YOUR OWN PROPERTY, BUT I -- IT MAY BE.  I DON'T KNOW.  I DON'T

7   WANT TO SPEAK OUT OF TURN ON THAT.

8        BUT --

9        THE COURT:  BUT I HAVE -- BUT WHAT I DO HAVE -- AND I

10  THINK IT'S FAIR FOR ME TO LOOK AT -- IS PROBABLE CAUSE WITH

11  BOTH, RIGHT? -- PROBABLE CAUSE WITH BOTH THE CRIMES THAT

12  INVOLVE FIRE.

13       MR. SHNEIDER:  THAT IS TRUE.  AND I WILL SAY THAT

14  WHAT I WAS GOING TO SAY ABOUT THE CURRENT CASE IN FEDERAL COURT

15  IS THAT HE DID NOT -- THERE'S NO EVIDENCE THAT HE BROUGHT ANY

16  SORT OF EQUIPMENT TO SET CARS ON FIRE.

17       WHAT HAPPENED WAS THERE -- AND THE GOVERNMENT --

18       THE COURT:  I MEAN, I CAN UNDERSTAND IF YOU DON'T

19  WANT TO MAKE ANY STATEMENTS, ESPECIALLY IF IT GOES --

20       MR. SHNEIDER:  NO.  I'M FINE.

21       THE COURT:  SO --

22       MR. SHNEIDER:  WE PUT -- WE AIRED THIS BEFORE --

23       THE COURT:  OH, OKAY.

24       OKAY.

25       MR. SHNEIDER:  THERE'S A VIDEO OF IT.  THERE'S NOT --

29

1   AND WHICH YOUR HONOR IS FREE TO SEE IF THAT WOULD HELP TIP THE

2   SCALES AS WELL.  AND WE COULD RESET IT.

3          BUT BASICALLY WHAT IT SHOWS IS SOMEONE -- THERE WAS A

4   WHOLE GROUP OF PEOPLE AROUND A CAR.  THERE WAS A PIECE OF

5   CARDBOARD ON FIRE AT THE TIME MR. WILSON REACHED INTO THE CAR.

6   AND HE ALLEGEDLY MANIPULATES THIS PIECE OF PAPER.  THAT'S WHAT

7   HAPPENED.  IT'S NOT A SITUATION WHERE HE -- HE ALLEGEDLY GOES

8   AROUND WITH A BLOWTORCH OR A LIGHTER OR ANYTHING REALLY

9   ACTUALLY.  AND THERE WAS A BIG GROUP OF PEOPLE.

10          SO, I UNDERSTAND THAT, YES, THERE ARE TWO THINGS THAT

11   GET -- END UP ON FIRE.  BUT I THINK THEY'RE PRETTY DIFFERENT.

12   AND I DO THINK THAT -- YES, YOU'RE RIGHT.  PROBABLE CAUSE HAS

13   BEEN ESTABLISHED BUT NOT GUILT BEYOND A REASONABLE DOUBT.  AND

14   THE WEIGHT OF THE EVIDENCE IS THE LEAST IMPORTANT FACTOR AS TO

15   OUR CASE.

16          SO, I DON'T THINK --

17          THE COURT:  BUT -- BUT IT'S NOT -- I UNDERSTAND THAT

18   INTELLECTUALLY.  I SOMETIMES WORRY THAT MAYBE -- WELL, GOSH,

19   THAT I'M GETTING IT WRONG OR THAT PEOPLE DON'T -- NOT THAT I'M

20   NOT MAKING MYSELF CLEAR.  I THINK IT'S THAT IT IS THE LEAST --

21   IF IT'S THE LEAST -- THE LEAST WEIGHT ASSIGNED TO IT.  BUT THEN

22   WHEN I HAVE ANOTHER CRIME, ALLEGED CRIME THAT I VIEW AS VERY,

23   VERY SERIOUS, RIGHT -- IF SOMEBODY -- IF THEY'RE -- EVEN IF

24   IT'S JUST PROBABLE CAUSE THAT SOMEONE HAS SET SOMETHING ON

25   FIRE, I FIND THAT VERY, VERY CONCERNING.

1          I MEAN, WE -- AND I THINK WITH LAY PEOPLE WE CAN ALL

2    COMPREHEND THE DANGER OF A FIRE.

3          SO, I GUESS THAT'S -- AND THE SIMILARITY OF IT.  I

4    MEAN, I'M NOT -- YOU KNOW, IT'S JUST THAT'S REALLY CONCERNING

5    TO ME.

6          MR. SHNEIDER:  AND --

7          THE COURT:  SO -- AND I THINK THAT'S JUST OUR POINT

8    OF DEPARTURE THERE, MR. SHNEIDER.

9          MR. SHNEIDER:  I UNDERSTAND.  I HEAR THE COURT'S

10   CONCERNS.  I DON'T WANT TO REPEAT MYSELF BUT THAT -- YOU KNOW,

11   OUR POSITION IS WHAT I'VE STATED.

12         AND THEN IN TERMS OF THE CASH DEPOSIT WITH THE COURT,

13   I UNDERSTAND.  I DON'T KNOW WHAT ETHICAL OR MORAL OR LEGAL

14   IMPLICATIONS ANY OF IT HAS.  I MEAN, THE LEGAL IMPLICATIONS ARE

15   LIKE YOU SAID I DON'T THINK IT MATTERS WHERE THE MONEY COMES

16   FROM UNLESS THERE'S A -- I FORGET THE NAME OF THE SUPREME COURT

17   CASE WHERE YOU HAVE TO TRACE FUNDS -- WHICH I DON'T THINK WE'RE

18   IN A DRUG SITUATION --

19         THE COURT:  NO.

20         MR. SHNEIDER:  AND WE'RE NOT IN THAT POSTURE.  SO --

21         THE COURT:  WELL, I THINK IF IT WERE CHILD SUPPORT

22   MONEY -- LIKE IF SHE WERE SAYING I HAVE CHILD SUPPORT MONEY

23   FROM SOMEBODY ELSE, THEN, I WOULDN'T, RIGHT?  I MEAN I THINK --

24         MR. SHNEIDER:  FAIR.

25         THE COURT:  IT'S --

1              MR. SHNEIDER:  IT'S NOT.  IT'S NOT.

2              AND I MEAN TO ME WHAT THIS MONEY MEANS FROM TALKING

3    TO MR. WILSON AND HIS DOMESTIC PARTNER MS. DENNINGS IS THAT

4    THEY BOTH WANT HIM OUT SO BADLY TO BE WITH HIS CHILD -- EVEN IF

5    HE'S NOT LIVING WITH HIS CHILD -- THAT THEY'RE WILLING TO PART

6    WITH THIS MONEY.  THAT COMBINED WITH -- AS YOUR HONOR STATED,

7    THAT THEY TRUST SO MUCH THAT HE WILL COMPLY WITH THE RULES OF

8    THE COURT.

9              SO, I DON'T VIEW THE MONEY IN THAT SAME WAY, BUT I

10   UNDERSTAND.  BUT THAT'S OUR POSITION.

11             AND THEN JUST BRIEFLY IN TERMS OF SOME OF THE THINGS

12   MS. MILSTEIN SAID, SHE REFERENCES PHOTOS AND INTERNET POSTS.

13             THE BOTTOM LINE IS NOTHING CAME OF ANY OF THAT.

14             THERE'S -- THERE'S NO VIOLENCE ALLEGED WITH FIREARMS.

15   THERE'S NO VIOLENCE AGAINST OTHER PEOPLE ALLEGED.

16             AND THE ONE POST FROM YEARS AGO WAS INVESTIGATED AND

17   CLEARED.

18             THE OTHER COUPLE OF PHOTOS THAT ARE REFERENCED FROM

19   FACEBOOK, ONE IS -- IT'S NOT CLEAR TO ME THAT THAT IS MR.

20   WILSON.  AND EVEN IF IT IS THOUGH -- WHICH WE DON'T CONCEDE --

21   BUT THERE WERE NO GUNS FOUND ANYWHERE ON THE PROPERTY WHERE HE

22   WAS.

23             I THINK -- I UNDERSTAND THE CONCERN.  BUT THERE ARE

24   NO ALLEGATIONS OF VIOLENCE OR FIREARMS WITH HIM PHYSICALLY.

25             AND, SO, I DON'T THINK THAT THAT ALSO ESTABLISHES

32

1   DANGER EVEN IN COMBINATION WITH THE OTHER THINGS WE'VE TALKED

2   ABOUT.

3          AND, SO, I -- I DON'T WANT TO REPEAT MYSELF.  I THINK

4   I'VE PUT EVERYTHING ELSE OUT THERE UNLESS YOUR HONOR HAS A

5   SPECIFIC QUESTION.

6          THE COURT:  NO.  AND I APPRECIATE THAT SO MUCH, MR.

7   SHNEIDER.  AS ALWAYS, YOU'VE DONE AN EXCELLENT JOB.

8          AND I DON'T WANT TO REPEAT MYSELF EITHER, ESPECIALLY

9   SINCE I -- I KNOW WE ONLY HAVE SO MUCH TIME IN FRONT OF -- TO

10  BE ABLE TO HAVE MR. WILSON HERE ON THIS TIMESLOT.

11         SO, MR. WILSON, I HOPE YOU'VE BEEN PAYING ATTENTION.

12         YOU CAN TELL I'M REALLY STRUGGLING WITH THIS.  AND I

13  HAVE TRIED TO BE AS TRANSPARENT AS POSSIBLE ABOUT WHAT CONCERNS

14  ME.

15         AND YOU HAVE -- FIRST OF ALL, YOU HAVE AN EXCELLENT

16  ATTORNEY.  AND I'M SURE HE'S GOING TO TAKE THIS TO THE DISTRICT

17  JUDGE.  AND WHO KNOWS WHAT WILL HAPPEN THERE.  BUT I AM SO

18  TROUBLED BY THESE -- WHAT I SEE AS ARSON-TYPE CRIMES THAT HAVE

19  BEEN CHARGED.

20         MR. SHNEIDER IS ABSOLUTELY RIGHT.  THERE IS A

21  PRESUMPTION OF INNOCENCE.  YOU HAVE NOT BEEN FOUND GUILTY OF

22  THOSE.  BUT THAT AT THIS STAGE MY JOB IS TO TAKE A LOOK AT

23  SOMETHING DIFFERENT -- NOT TO ADJUDICATE YOU AS GUILTY OR NOT

24  GUILTY.

25         AND, SO, INSTEAD I HAVE DIFFERENT INFORMATION THAT I

33

1   BELIEVE IS -- YOU KNOW, CERTAIN THINGS ARE CLEAR.  AND THERE'S

2   NO DISPUTE, WHICH IS THAT PROBABLE CAUSE FINDING HAS BEEN MADE

3   WITH RESPECT TO THE FEDERAL CASE THAT'S REFLECTED IN THE GRAND

4   JURY'S INDICTMENT.

5           AND THEN WHAT I WAS ASKING THE ATTORNEYS ABOUT

6   EARLIER WHICH IS IT SOUNDS LIKE A BAIL OR A WARRANT HAS BEEN

7   ISSUED DOWN IN IRVINE WHICH TELLS ME THAT THERE HAS BEEN SOME

8   TYPE OF PROBABLE CAUSE FINDING -- SOME TYPE OF CHARGE THAT'S --

9   THAT'S BEEN ISSUED.  AND YOU WILL HAVE TO GO APPEAR ON THAT IN

10  SOME WAY, SOMEHOW.

11          I'M REALLY --

12          THE DEFENDANT:  SO, I --

13          THE COURT:  OH, COULD I JUST ASK YOU --

14          THE DEFENDANT:  I GUESS --

15          THE COURT:  -- SOMETHING.  OH, I'M SORRY.  I JUST --

16          THE DEFENDANT:  YEAH.  I --

17          THE COURT:  -- WANT TO ASK YOU NOT TO SAY ANYTHING AT

18  THIS POINT BECAUSE IT COULD BE USED AGAINST YOU.

19          WE HAVE A REPORTER TRANSCRIBING EVERYTHING.  YOU'LL

20  BE ABLE TO TALK TO MR. SHNEIDER.  YOU'LL BE ABLE TO ADDRESS ALL

21  THESE POINTS WHEN YOU PUT TOGETHER YOUR APPEAL PACKET TO THE

22  DISTRICT JUDGE ON ALL OF THIS.

23          AND IF I GOT ANYTHING WRONG, THE ATTORNEYS AND YOU

24  CAN -- CAN CORRECT THAT.

25          BUT THAT REALLY TROUBLES ME.  I UNDERSTAND THAT THE

1   CHARGE HERE IS -- RECEIVES THE LEAST WEIGHT WHEN I MAKE A

2   DETERMINATION.

3           SO, HOPEFULLY, IN TRYING TO MAKE IT CLEAR IN

4   EVALUATING ERROR, IT'S NOT THAT I'M -- I'M GIVING I DON'T THINK

5   AN UNDUE AMOUNT OF WEIGHT TO THE CHARGE I HAVE HERE.  IT'S THE

6   COMBINATION OF THAT CHARGE AND THE SIMILARITY OF THAT CHARGE TO

7   SOMETHING ELSE THAT'S HAPPENED PRETTY RECENTLY WITH -- AND

8   WHICH IS COMING OUT OF IRVINE, THE ARSON.  I DON'T KNOW.  LIKE

9   MR. SHNEIDER I DON'T -- I'VE NEVER DEALT WITH A STATE ARSON

10  CASE.  I DON'T KNOW WHAT THE DEFENSES ARE.

11          I DON'T THINK IT'S FOR ME NECESSARILY TO GIVE WEIGHT,

12  OR I DON'T THINK I HAVE AN OBLIGATION TO INQUIRE INTO THAT, NOR

13  WOULD MR. SHNEIDER WANT ME TO GO DOWN THAT ROAD.  I JUST SEE

14  TWO REALLY SIMILAR CASES -- CHARGES THAT ARE REALLY TROUBLING

15  TO ME.  REALLY, REALLY TROUBLING ARSON-TYPE CASES.

16          ADDITIONALLY, I SEE -- YOU KNOW, LOOK, FAMILIES'

17  RELATIONSHIPS ARE DIFFICULT.  ALL FAMILIES.  BUT I'M NOT SO

18  PERSUADED -- I THINK AS MR. SHNEIDER AND YOU ARE THAT RESIDING

19  WITH YOUR GRANDPARENTS IS GOING TO PROVIDE THE STABILITY THAT

20  WE -- THAT YOU HOPE OR ANTICIPATE.  SO, I HAVE CONCERNS ABOUT

21  THAT.

22          SO, I'M GOING TO DENY THE REQUEST, MR. WILSON.

23          YOU AND YOUR ATTORNEY -- BECAUSE YOU'VE DONE THIS

24  BEFORE -- YOU CAN TAKE THIS TO JUDGE OLGUIN WHO I THINK MAY

25  HAVE ALREADY INDICATED THAT HE COULD SEE SOME COMBINATION

35

1   HERE.  PROBABLY WILL MAYBE DISAGREE WITH ME.  I DON'T KNOW.

2           BUT I JUST HAVE TO MAKE MY DECISION BASED ON THE

3   INFORMATION THAT I HAVE IN FRONT OF ME.

4           I KNOW THIS IS DISAPPOINTING.  YOU HAVE A NEWBORN AT

5   HOME.  I IMAGINE YOU'RE SO EAGER TO SPEND TIME WITH HIM.  I

6   KNOW THAT'S IMPORTANT.  I WANT YOU TO BE ABLE AT SOME POINT TO

7   DO THAT.  BUT RIGHT NOW I JUST -- I'M NOT PERSUADED THAT WHAT

8   I'M SEEING IS GOING TO MAKE SURE THAT EVERYONE STAYS SAFE AND

9   THAT YOU SHOW UP FOR APPEARANCES AS DIRECTED.

10          MR. SHNEIDER, DO YOU WANT TO PUT ANYTHING ON THE

11  RECORD?

12          DO YOU WANT ME TO ADDRESS ANYTHING SO THAT YOU HAVE

13  IT TO TAKE TO JUDGE OLGUIN?

14          MR. SHNEIDER:  NOT THAT I CAN THINK OF, YOUR HONOR.

15  I THINK WE FULLY FLUSHED OUT ALL THE ISSUES.

16          THE COURT:  OKAY.

17          MS. MILSTEIN, IS THERE ANYTHING YOU THINK -- LIKE,

18  YOU KNOW, WHY DIDN'T SHE TALK ABOUT X, Y, OR Z?

19          MS. MILSTEIN:  NO, YOUR HONOR.

20          THANK YOU.

21          THE COURT:  ALL RIGHT.

22          MR. SHNEIDER, AGAIN, YOU DID AN EXCELLENT JOB.  I

23  KNOW -- I TRIED TO MAKE CLEAR WHERE I THINK OUR POINTS OF

24  DEPARTURE ARE.  AND SO -- AND I KNOW YOU'LL DO WHAT YOU HAVE TO

25  DO NEXT.

36

1              THANK YOU SO MUCH.

2              MR. SHNEIDER:  THANK YOU, YOUR HONOR.

3              I'LL JUST SAY, MR. WILSON, IF YOU CAN CALL ME LATER

4    THIS AFTERNOON.  WE'LL TALK.  AND I'LL BE BY MDC SOON.  OKAY.

5              THE DEFENDANT:  OKAY.

6              THE COURT:  ALL RIGHT.  THANK YOU.

7              THE DEFENDANT:  THANK YOU.

8              THE COURT:  I KNOW YOU HAVE SOMEPLACE TO GO, MR.

9    SHNEIDER.

10             MR. SHNEIDER:  YES.

11             THANK YOU.

12             (PROCEEDINGS CONCLUDED.)

37

1

2

3

4                        C E R T I F I C A T E

5

6

7

8          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
     FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
9    ABOVE-ENTITLED MATTER.

10

11   /S/ DOROTHY BABYKIN                      7/7/21
     _____      _____
12   FEDERALLY CERTIFIED TRANSCRIBER         DATED
     DOROTHY BABYKIN

13

14

15

16

17

18

19

20

21

22

23

24

25