1 CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
2 HOWARD SHNEIDER (Bar No. 30949)
(E-Mail:  Howard_Shneider@fd.org)
3 Deputy Federal Public Defender
321 East 2nd Street
4 Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
5 Facsimile:  (213) 894-0081

6 Attorneys for Defendant
NATHAN WILSON

7

8

9                 **UNITED STATES DISTRICT COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11                     **WESTERN DIVISION**

12

13 UNITED STATES OF AMERICA,           Case No. CR 20-516-FMO-1

14              Plaintiff,

15        v.                                      **NOTICE OF MOTION AND
                                                 MOTION TO DISMISS PURSUANT
16 NATHAN WILSON,                       TO FED. R. CRIM. P. 12(b)(3)(A)(iv),
                                                 OR, IN THE ALTERNATIVE,
                                                 MOTION TO COMPEL
17              Defendant.                    DISCOVERY**

18                                              Hearing Date:   December 3, 2021
                                                 Hearing Time:   2:00 p.m

19

20        Please take notice that on December 3, 2021, or as soon thereafter as it may be

21 heard in the courtroom of the Honorable Fernando M. Olguin, Nathan Wilson, through

22 his counsel, will move to dismiss the indictment based on Federal Rule of Criminal

23 Procedure 12(b)(3)(A)(iv), or, in the alternative, to compel discovery for selective

24 prosecution in violation of the Fifth Amendment and Fourteenth Amendments.

25        This motion is based on the memorandum of points and authorities, exhibits, and

26 all other records in this case.

27        Wilson previously made a discovery request for the items referenced in the

28

                                              1

1  alternative proposed order to compel discovery. The government responded to the

2  discovery request with a letter explaining why it believes the requested materials should

3  not or could not be turned over.

4       The government and Wilson are in the process of filing a stipulation to continue

5  the trial date to December 14, 2021, or a later date. Wilson proposes the following

6  briefing schedule for the motion to dismiss: government's opposition to be filed by

7  November 12, 2021; Wilson's reply to be filed by November 19, 2021; hearing on the

8  motion to take place on December 3, 2021

9

10                                        Respectfully submitted,

11                                        CUAUHTEMOC ORTEGA
                                          Federal Public Defender
12

13

14  DATED:  October 12, 2021        By  */s/ Howard Shneider*

15                                        HOWARD SHNEIDER
                                          Deputy Federal Public Defender
16                                        Attorney for Nathan Wilson

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

I. INTRODUCTION ...............................................................................................1

II. STATEMENT OF FACTS ................................................................................2

    A.    Federal Prosecutions of Arson Cases ..................................................2

        1.    Protest Cases ........................................................................3

               a.    *Alvarado* ...................................................................3

               b.    *Tillmon* ....................................................................3

               c.    *Espriu* .......................................................................3

               d.    *Wilson and Beasley* .................................................4

        2.    Non-Protest Arson Cases ...................................................4

    B.    Arson in the Central District of California ..........................................5

        1.    Arson in the city of Los Angeles .......................................5

        2.    Arson in the Counties of the Central District of California.............6

        3.    Arson Prosecutions by the Los Angeles District Attorney's Office .....................................................................................7

        4.    Arson in the City of Santa Monica .....................................8

    C.    Federal Policies in Response to the George Floyd Protests.........................8

        1.    DOJ's and USAO's Prosecutorial Policies Targeting Protesters ......8

III. ARGUMENT .................................................................................................11

    A.    DOJ's and USAO's policy to selectively prosecute persons believed to be espousing anti-government views is unconstitutional. .........................11

        1.    The government cannot target only those believed to hold anti-government views for prosecution.....................................11

        2.    The prosecutorial policy had a discriminatory effect. ...........12

        3.    The prosecutorial policy had an explicit discriminatory purpose. ..15

        4.    There is sufficient direct and circumstantial evidence that Wilson's prosecution was based on a discriminatory purpose.......17

    B.    At a minimum, Wilson is entitled to discovery because there is "some evidence" of discriminatory effect and discriminatory purpose.................19

        1.    There is "some evidence" of discriminatory effect and purpose here.......................................................................21

# TABLE OF CONTENTS

Page

IV. CONCLUSION ...........................................................................................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Gibbs v. Babbitt*,
    214 F.3d 483 (4th Cir. 2000) ........................................................................ 13

*Gulf Coast Hotel–Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*,
    658 F.3d 500 (5th Cir. 2011) ........................................................................ 13

*Hartman v. Moore*,
    547 U.S. 250 (2006)................................................................................. 11, 18

*Oyler v. Boles*,
    368 U.S. 448 (1962)........................................................................................ 18

*United States v. Armstrong*,
    517 U.S. 456 (1996)................................................................................*passim*

*United States v. Bass*,
    536 U.S. 862 (2002)........................................................................................ 20

*United States v. Brown*,
    9 F.3d 1374 (8th Cir. 1993) ........................................................................... 11

*United States v. Falk*,
    479 F.2d 616 (7th Cir. 1973) (en banc) ........................................................ 18

*United States v. Garcia*,
    768 F.3d 822 (9th Cir. 2014) ......................................................................... 13

*United States v. Gomez-Lopez*,
    62 F.3d 304 (9th Cir. 1995)...................................................................... 20, 21

*United States v. Lee*,
    786 F.2d 951 (9th Cir. 1986) ......................................................................... 11

*United States v. Mahon*,
    804 F.3d 946 (9th 2015) ................................................................................ 13

*United States v. McGraw-Hill Co., Inc.*,
    2014 WL 1647385 (C.D. Cal. Apr. 15, 2014)............................................... 21

*United States v. Renteria*,
    557 F.3d 1003 (9th Cir. 2009) ....................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Sellers*,
  906 F.3d 848 (9th Cir. 2018) ................................................................20, 21

*United States v. Shriver*,
  838 F.2d 980 (8th Cir. 1988) .....................................................................13

*United States v. Steele*,
  461 F.2d 1148 (9th Cir. 1972) ....................................................11, 18, 19

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...............................................................................17, 20

*Wayte v. United States*,
  470 U.S. 598 (1985)...............................................................................11, 18

*Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*,
  701 F.3d 1345 (11th Cir. 2012) ................................................................13

**Docketed Cases**

*United States v. Alvarado*,
  20-cr-0331-RGK (CA Cal. July 15, 2020) ................................................

*United States v. Beal*,
  19-cr-0047-JLS (CA Cal. Mar. 1, 2019) ...................................................

*United States v. Espriu*,
  20-cr-0171-PA (CA Cal. Sept. 10, 2020) ................................................ 3

*United States v. Tillmon*,
  20-cr-00289-MWF (CA Cal. June 25, 2020) ............................................

*United States v. Wilson*,
  20-cr-516-FMO (CA Cal. Oct. 9, 2020 ......................................................

*United States v. Wright*,
  17-0229-JGB, (Ca Cal. Nov.6, 2017) ........................................................

**Federal Statutes**

18 U.S.C. § 666(a)(1)(B) ..............................................................................5

18 U.S.C. § 844................................................................................*passim*

18 U.S.C. § 924(c) .................................................................................4, 14

iv

## **TABLE OF AUTHORITIES**

**Page(s)**

18 U.S.C. § 2332a(a)(2) ...................................................................4, 14

26 U.S.C. § 5861(c) ....................................................................... 3

26 U.S.C. § 5861 (d) ....................................................................4, 14

U.S. Const amend I ......................................................................... 19

U.S. Const. amend V. ...............................................................2, 11, 19

U.S. Const. amend XIV ..............................................................2, 19

**State Statutes**

Cal. Penal Code § 451 ....................................................................... 7

**Miscellaneous**

ABC News, *Trump to Mobilize Federal Resources to Stop Violence, Restore Security* (June 1, 2020), https://bit.ly/Trump-Mobilizes ................................ 9

Aruna Viswanatha & Sadie Gurman, *Barr Tells Prosecutors to Consider Charging Violent Protesters With Sedition*, The Wall Street Journal (Sept. 17, 2020), https://bit.ly/Barr-Protesters. ................................. 10, 16

Brakkton Booker, et al., *Violence Erupts As Outrage Over George Floyd's Death Spills Into a New Week*, NPR (June 1, 2020), https://bit.ly/Floyd-Death ................................................................... 8

Brian Rokos, *Convicted arsonist now accused of torching Orange County business, burglarizing fire stations*, Orange County Register (Aug. 17, 2019), https://bit.ly/OC-arson; ................................................ 14

Cal. DOJ, Open Justice, *Crimes & Clearances* https://openjustice.doj.ca.gov/exploration/crime-statistics/crimes-clearances ................................................................ 5

Chris Woodyard, *GM bailout played out over five years*, USA Today (Dec. 9, 2013) , https://bit.ly/GM-bailout ................................. 12

Christopher Damien, *Brandon McGlover pleads guilty to arson charges in Cranston Fire case, gets 12 years in prison*, Desert Sun (Feb. 14, 2019), https://bit.ly/Cranson-fire ................................................ 14

v

# TABLE OF AUTHORITIES

**Page(s)**

1   CNN, *President Trump's call with US governors over protests* (June 1.
2       2020), https://bit.ly/Trump-call .......................................................9, 10, 16

3   DOJ, *Attorney General William P. Barr's Statement on Riots and*
4       *Domestic Terrorism* (Mar. 31, 2020), https://bit.ly/Barr-on-terrorism ................... 16

5   DOJ, *Attorney General William P. Barr's Statement on Riots and*
6       *Domestic Terrorism* (May 31, 2020), https://bit.ly/Barr-on-terrorism .......................9

7   DOJ, *Attorney General William P. Barr's Statement on the Death of*
        *George Floyd and Riots* (May 30, 2020), https://bit.ly/Barr-statement ...............8, 16
8
9   DOJ, FBI, Table 10, Offense Known to Law Enforcement, *2016 Crime in*
10      *the United States* (Fall 2017), https://ucr.fbi.gov/crime-in-the-
        u.s/2016/crime-in-the-u.s.-2016/tables/table-8/table-8-state-
11      cuts/california.xls; ............................................................................................7

12  DOJ, FBI, Table 10, Offense Known to Law Enforcement, *2017 Crime in*
13      *the United States* (Fall 2018), https://ucr.fbi.gov/crime-in-the-
        u.s/2017/crime-in-the-u.s.-2017/tables/table-10/table-10-state-
14      cuts/california.xls; ............................................................................................7

15  DOJ, FBI, Table 10, Offense Known to Law Enforcement, *2018 Crime in*
16      *the United States* (Fall 2019), https://ucr.fbi.gov/crime-in-the-
        u.s/2018/crime-in-the-u.s.-2018/tables/table-10/table-10-state-
17      cuts/california.xls; ............................................................................................7

18  DOJ, *United States Attorney Nick Hanna to Leave Justice Department*
19      *after Serving as Chief of Federal Law Enforcement Officer in L.A. for 3*
        *Years* (Jan. 4, 2021), https://www.justice.gov/usao-cdca/pr/united-
20      states-attorney-nick-hanna-leave-justice-department-after-serving-
21      chief-federal ..................................................................................................... 14

22  Jonah Valdez, *Arson suspect arrested in separate incident a day after San*
        *Gabriel Mission fire*, San Gabriel Valley Tribune (July 22, 2020),
23      https://bit.ly/Mission-fire ................................................................................ 14

24  Life, Liberty & Levin, Bill Barr: Antifa is *"New Form of Urban Guerrilla*
25      *Warfare"* (Aug. 9, 2020), https://bit.ly/Barr-on-Antifa ........................................ 10

26  Los Angeles City, Crime Data from 2010 - 2019,
27      https://data.lacity.org/Public-Safety/Crime-Data-from-2010-to-
        2019/63jg-8b9z/data#revert. .........................................................................5, 6
28

vi

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

Los Angeles City, *Crime Data from 2020 to Present*,
https://data.lacity.org/Public-Safety/Crime-Data-from-2020-to-
Present/2nrs-mtv8 ................................................................................................5

*Memorandum Regarding Department of Justice Task Force on Violent
Anti-Government Extremists* (June 26, 2020), https://bit.ly/Memo-task-
force ...............................................................................................................10, 16

Phoebe Wall Howard, *Ford took $6B government loan in 2009—and debt
still haunts the company*, Detroit Free Press (Aug. 1, 2020),
https://bit.ly/Ford-bailout.................................................................................12

Santa Monice Open Data, *Police Incidents*, https://data.smgov.net/Public-
Safety/Police-Incidents/kn6p-4y74 ....................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Until the summer of 2020, the United States Attorney's Office in this District had not pursued a prosecution for 18 U.S.C. § 844(f), the charge in Nathan Wilson's case, in almost 13 years. And it had not pursued a stand-alone charge of 18 U.S.C. § 844(i), another federal arson crime, in almost 20 years. The absence of federal arson cases cannot be attributed to a lack of arson in the District. Indeed, over the last 20 years there have been thousands of arson charges in the seven counties that make up the Central District of California. Instead, the United States Attorney's Office's decision to prosecute Wilson for federal arson is the result of an unconstitutional policy targeting persons the government believed to be anti-government protesters.

In late May 2020, millions of Americans across the country took to the streets to protest police brutality and racial injustice after George Floyd was murdered by Minneapolis police officers. Several protests occurred across Los Angeles, including in Santa Monica. Thousands of Angelenos marched through the streets, some carrying signs and others marching or simply observing in solidarity. In response to the widespread protests, the United States Department of Justice issued policies directing United States Attorney's Offices throughout the country to target and charge so-called "anti-government" protesters engaged in criminal activity and to prosecute them differently and more harshly than others engaged in the same conduct. The United States Attorney's Office for the Central District of California adopted and implemented that discriminatory policy, charging Wilson because the alleged arson occurred during the George Floyd protests in Los Angeles.

Wilson recognizes that his constitutional right to freedom of expression and association does not immunize him from prosecution for unlawful conduct. But like all Americans, he is entitled to equal protection of the laws. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996). The fact that he was identified as a target by the President and Attorney General and charged with a federal crime for his conduct while, for the last 20

1

years, other similarly situated individuals in the Central District were not federally prosecuted violates the Fifth and Fourteenth Amendments. For this reason, the Court should dismiss the indictment.

In the alternative, Wilson is entitled to discovery on his motion for selective prosecution. There is far more than "some evidence" of discriminatory purpose and effect in his prosecution entitling him to discovery. *United States v. Armstrong*, 517 U.S. 456, 468 (1996). There are admissions from the government of its discriminatory intent and there is significant direct and circumstantial evidence supporting Wilson's claim. At a minimum, Wilson is entitled to discovery.

## II. STATEMENT OF FACTS

### A.   Federal Prosecutions of Arson Cases

As an initial matter, there are two subsections of 18 U.S.C. § 844 that punish federal arson. The two subsections have different jurisdictional bases: § 844(f) covers property in which the federal government has a possessory or financial interest, and § 844(i) covers property used in interstate and foreign commerce. But both subsections punish identical conduct: that the defendant "maliciously damage[d] or destroy[ed], or attempt[ed] to damage or destroy, by means of fire or an explosive," the property at issue. Because the conduct criminalized by subsections (f) and (i) is the same, for purposes of this motion they will be considered together and referred to collectively as federal arson.

In the last 20 years, the United States Attorney's Office for the Central District of California (USAO) has filed only 4 cases that included alleged violations of § 844(f) and only 11 cases that included alleged violations of § 844(i). See Ex. A (ECF Criminal Case Reports for § 844(f)); Ex. B. (ECF Criminal Case Reports for § 844(i)). In the last ten years, the USAO has filed only six cases that included a federal arson charge at all:

(1) *United States v. Wright*, 17-0229-JGB, filed on November 6, 2017;

(2) *United States v. Beal*, 19-cr-0047-JLS, filed on March 1, 2019;

(3) *United States v. Tillmon*, 20-cr-00289-MWF, on June 25, 2020;

(4) *United States v. Alvarado*, 20-cr-0331-RGK, filed on July 15, 2020

2

(5) *United States v. Espriu*, 20-cr-0171-PA, filed on September 10, 2020; and

(6) *United States v. Wilson*, 20-cr-516-FMO, filed October 9, 2020.

*See* Exs. A & B. Of those six cases, four relate to alleged criminal conduct that occurred during or related to protest activity. Those four, Alvarado, Espriu, Tillmon, and Wilson all involve alleged conduct that occurred on May 30th or 31st, 2020, during the George Floyd protests.

### 1.    Protest Cases

#### a.    *Alvarado*

On July 15, 2020, the government filed the complaint in Alvarado, alleging that Alvardo violated § 844(i) by setting a fire inside a restaurant on May 30, 2020, during the George Floyd protests. 20-cr-0331-RGK, ECF No. 1. The government asserted that the building was "used in interstate and foreign commerce," and that it "draws customers from all over the country and all over the world" who "paid for their meals using credit or debit cards attached to banks from all over the country and all over the world." Id. According to the Complaint, the FBI, LAPD, LAFD, Santa Monica Police Department, Beverly Hills Police Department, and other state and local law enforcement agencies, conducted the investigation leading to the federal arson charge against Alvarado.

#### b.    *Tillmon*

On June 25, 2020, the government filed the complaint in Tillmon, alleging that Tillmon violated § 844(i) by setting a fire inside a restaurant on May 31, 2020, during the George Floyd Protests. 20-cr-00289-MWF, ECF No. 1. According to the complaint, ATF agents and local police investigated the fire. *Id*. at 3. The government again asserted federal jurisdiction because the restaurant "served customers from all over the country and all over the world" and "most customers paid for their meals using credit or debit cards attached to banks from all over the country and all over the world." *Id*. at 4, n.2.

#### c.    *Espriu*

The defendant in Espriu was charged with § 844(i), attempted arson of a building used in interstate commerce, and 26 U.S.C. § 5861(c), unlawful possession of a firearm

3

1    and destructive device, namely the "Molotov cocktail" allegedly used in the attempted

2    arson. 20-cr-0171-PA, ECF No. 6. The charges stem from the attempted arson of a

3    building that housed the East Valley Republican Women Federated on May 31, 2020. Id.

4    Again, the government asserted that the building was "used in interstate and foreign

5    commerce, and used in activities affecting interstate and foreign commerce . . ." *Id.*

6              ### d.    *Wilson and Beasley*

7              On October 9, 2020, the government filed the complaint in the instant case,

8    alleging that Wilson violated § 844(f) by contributing to the arson of a Santa Monica

9    Police Department (SMPD) vehicle when he allegedly manipulated a piece of yellow

10   poster that was on fire inside the car. ECF No. 1 at 7-8. The government asserts that

11   SMPD receives federal financial assistance, which in the government's view is sufficient

12   to establish jurisdiction under § 844(f). *See id*. at 15. When it filed an indictment, the

13   government also charged Christopher Beasley as a co-defendant. The complaint does not

14   refer to Beasley by name, but describes his alleged actions as filming the incident and

15   giving verbal directions to Wilson. *See id*. at 7-8.

16             ## 2.    **Non-Protest Arson Cases**

17             By contrast, the two federal arson cases filed in the last nine years before 2020,

18   Beal and Wright, involved other serious federal crimes stemming from federal

19   investigations completely unrelated to political protests. Beal, for example, involved a

20   death and the serious injury of multiple people following the defendant's alleged mailing

21   of a box containing a "'weapon of mass destruction' to kill his ex-girlfriend . . . ." 19-cr-

22   0047-JLS, ECF No. at 1. The FBI's Evidence Response Team responded to the scene the

23   day of the explosion. *Id*. at 1 at 4 ("FBI ERT, and bomb technicians responded to the

24   scene . . . ."). Subsequently, the defendant was charged with violations of 18 U.S.C. §

25   2332a(a)(2), use of a weapon of mass destruction resulting in death; 18 U.S.C. § 844(i),

26   malicious destruction of a building resulting in death; 18 U.S.C. § 924(c), use of a

27   destructive device during and in relation to a crime of violence; and 26 U.S.C. § 5861

28   (d), possession of an unregistered destructive device. *Id*. at ECF No. 14.

                                            4

The charges in Wright, "stem from a public corruption investigation" that began after the FBI received information that the defendant, the mayor pro tem, was receiving bribes. 17-cr-229-JGB, ECF No. 1, 2 at ¶ 4. The attempted arson charge arose when, "[d]uring the investigation, WRIGHT solicited assistance from the [informant] in committing arson" to destroy the defendant's own restaurant to collect insurance payments. *Id.* at 2-3 at ¶ 5. The defendant was charged with 18 U.S.C. § 666(a)(1)(B), bribery of programs receiving federal funds, and 18 U.S.C. § 844(i), the attempted arson of a building. ECF No. 11.

## B.   Arson in the Central District of California

Despite the limited federal arson charges filed in this district, the Central District of California has hardly been free from arson. From 2010 through 2019, there were on average 3,500 reported arsons each year for the seven counties that comprise the Central District of California. See Cal. DOJ, Open Justice, *Crimes & Clearances* https://openjustice.doj.ca.gov/exploration/crime-statistics/crimes-clearances (publishing criminal justice data); Ex. C (PDF of collected data of reported crimes); Ex. D (PDF of collected data of cleared cases). As broken down in more detail below, from 2016 through 2020, there were over 2,000 arson incidents in the city of Los Angeles alone and over 1,000 arsons between 2016 through 2019 within the Central District's seven counties of which the federal government was aware because it tracked and documented those arsons.

### 1.   Arson in the city of Los Angeles

In 2020, the city of Los Angeles reported 666 arsons cases. *See* Los Angeles City, *Crime Data from 2020 to Present*, https://data.lacity.org/Public-Safety/Crime-Data-from-2020-to-Present/2nrs-mtv8 (collecting data provided by the Los Angeles Police Department); Ex. E (Excel spreadsheet of collected data). Hundreds of arsons were also reported in the City of Los Angeles from 2016-2019: in 2019, 419 arsons; in 2018, 361 arsons; in 2017, 401 arsons; and in 2016, 413 arsons. See Los Angeles City, Crime Data from 2010 - 2019, https://data.lacity.org/Public-Safety/Crime-Data-from-2010-to-

2019/63jg-8b9z/data#revert; Exs. F-I (Excel spreadsheets of collected data from 2016-2019). Each year, many of the arsons were categorized as vehicle arsons: in 2020, 37 vehicle arsons; in 2019, 14 vehicle arsons; in 2018, 17 vehicle arsons; in 2017, 26 vehicle arsons; and in 2016, 39 vehicle arsons.

### 2. Arson in the Counties of the Central District of California

More broadly speaking, there were many arson cases in the seven counties that comprise the Central District of California. Over 1,000 of these were documented by and known to the federal government from 2016 to 2019.

As reported by the California Department of Justice, in the seven counties that comprise the Central District there were an average of 3,500 arson cases per year between 2010 and 2019. *See* Ex. C. Hundreds of these arson cases resulted in arrests and prosecution, i.e., "clearances," each year. *See* Ex. D. On average, 559 arson cases were cleared annually from 2010 to 2019. *Id.*

The federal government also tracked arsons in this District. In 2019, for example, the FBI's Uniform Crime Report for "Offenses Known to Law Enforcement" listed 220 arsons in Los Angeles County, 53 arsons in San Bernardino County, 24 in Riverside County, 4 in Orange County, 13 in Ventura County, 7 in San Luis Obispo County, and 8 in Santa Barbara County. DOJ, FBI, Table 10, Offense Known to Law Enforcement, 2019 *Crime in the United States* (Fall 2020), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-10/table-10-state-cuts/california.xls (listing only those offenses reported by the sheriff's offices or county police departments); see Ex. J (highlighting counties in the Central District of California). In total there were 329 arson offenses known to federal law enforcement in 2019 within counties comprising the Central District of California.

In 2018, the FBI's Uniform Crime Report listed 232 arsons in Los Angeles County, 65 in San Bernardino County, 17 in Riverside County, 16 in Orange County, 7 in Ventura County, 4 in San Luis Obispo County, and 3 in Santa Barbara County. DOJ, FBI, Table 10, Offense Known to Law Enforcement, *2018 Crime in the United States* (Fall 2019),

https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-10/table-10-state-cuts/california.xls; *see* Ex. K (highlighting counties in the Central District of California). In total, there were 344 known arson offenses in this District in 2018.

In 2017, the FBI's Uniform Crime Report listed 253 arsons in Los Angeles County, 70 in San Bernardino County, 28 in Riverside County, 3 in Orange County, 8 in Ventura County, 5 in San Luis Obispo County, and 6 in Santa Barbara County. DOJ, FBI, Table 10, Offense Known to Law Enforcement, *2017 Crime in the United States* (Fall 2018), https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/table-10/table-10-state-cuts/california.xls; *see* Ex. L (highlighting counties in the Central District of California). In 2017, there were 373 known arson offenses in the District.

Finally, in 2016, the FBI's Uniform Crime Report listed 227 arsons in Los Angeles County, 54 in San Bernardino County, 22 in Riverside County, 11 in Orange County, 11 in Ventura County, 10 in San Luis Obispo County, and 7 in Santa Barbara County. DOJ, FBI, Table 10, Offense Known to Law Enforcement, *2016 Crime in the United States* (Fall 2017), https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/tables/table-8/table-8-state-cuts/california.xls; see Ex. M (highlighting counties in the Central District of California). In 2016, there were 342 known arson offenses in the District.

### 3.    Arson Prosecutions by the Los Angeles District Attorney's Office

In addition to the thousands of reported cases in this District, there were also hundreds of arson cases charged locally by the Los Angeles District Attorney's Office. From 2017 through 2020, the District Attorney's Office filed 477 charges alleging a violation of California Penal Code § 451, felony arson. Ex. N (declaration from Los Angeles County Public Defender's Office regarding Cal. Penal Code §451 cases). The Los Angeles District Attorney's Office filed 465 charges alleging a violation of § 451 in 2020, 449 charges in 2019, 465 charges in 2018, and 477 charges in 2017. Id.

///

///

### 4. Arson in the City of Santa Monica

Although much smaller than the city of Los Angeles, Santa Monica also had its fair share of reported arson cases between 2016 and 2020. Specifically, in 2020 there were 71 reported arson cases, in 2019 there were 33 reported cases, in 2018 there were 22 reported cases, in 2017 there were 33 reported cases, and in 2016 there were 20 reported cases. *See* Santa Monica Open Data, *Police Incidents*, https://data.smgov.net/Public-Safety/Police-Incidents/kn6p-4y74 (collecting data provided by the Santa Monica Police Department); Exs. O-S (Excel spreadsheets of collected data from 2016-2020).

## C. Federal Policies in Response to the George Floyd Protests

On May 25, 2020, George Floyd, a Black Minnesotan, was murdered by a Minneapolis police officer. Weeks of demonstrations throughout the country and the world followed. While most of these protests were peaceful, some involved violence and the destruction of property. Brakkton Booker, et al., *Violence Erupts As Outrage Over George Floyd's Death Spills Into a New Week*, NPR (June 1, 2020), https://bit.ly/Floyd-Death.

### 1. DOJ's and USAO's Prosecutorial Policies Targeting Protesters

On May 30, 2020, former Attorney General William Barr issued a "Statement on the Death of George Floyd and Riots." DOJ, *Attorney General William P. Barr's Statement on the Death of George Floyd and Riots* (May 30, 2020), https://bit.ly/Barr-statement. The Attorney General stated that while "[j]ustice will be served," for the death of Mr. Floyd, "protests had been hijacked by violent radical elements." *Id.* "Groups of outside radicals and agitators are exploiting the situation to pursue their own separate and violent agenda. In many places, it appears the violence is planned, organized, and driven by anarchistic and far left extremists, using Antifa-like tactics . . . ." *Id.* The Attorney General declared that "[t]he Department of Justice . . . and all of our 93 U.S. Attorneys across the country, will support these local efforts and take all action necessary to enforce federal law." *Id.*

The following day, Attorney General Barr issued a "Statement on Riots and Domestic Terrorism." DOJ, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism* (May 31, 2020), https://bit.ly/Barr-on-terrorism. The Attorney General explained that "[f]ederal law enforcement actions will be directed at apprehending and charging the violent radical agitators who have hijacked peaceful protest and are engaged in violations of federal law. . . . The violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly." *Id*.

On June 1, 2020, in an address in the Rose Garden, former President Donald Trump stated that "our nation has been gripped by professional anarchists, violent mobs, arsonists, looters, criminal, rioters, Antifa, and others. . . . I want the organizers of this terror to be on notice that you will face severe criminal penalties and lengthy sentences in jail. This includes Antifa and others who are leading instigators of this violence." ABC News, *Trump to Mobilize Federal Resources to Stop Violence, Restore Security* (June 1, 2020), https://bit.ly/Trump-Mobilizes. That same day, President Trump and the Attorney General held a call with state governors. President Trump explained that the federal government "will activate Bill Barr and activate him very strongly." CNN, *President Trump's call with US governors over protests* (June 1. 2020), https://bit.ly/Trump-call. The Attorney General explained that in "most places, you have this ingredient of extremist anarchist agitators . . . ." *Id*. He explained that federal law enforcement needed to "go after the guys that are throwing the bricks and (inaudible) . . . running around starting fires." *Id.* President Trump singled out the May 31 Los Angeles protest: "It's terrible. Of all the places, what went on in Los Angeles with the stores and the . . . is terrible. Total domination, you have to dominate." *Id.*  President Trump added, "You've got to arrest these people and you've got to judge them, and you can't do the deal where they get one week in jail. These are terrorists . . . they're looking to do bad things to our country. They're Antifa and they're radical left." *Id*.

///

Subsequently, the Attorney General sent a memorandum to all United States Attorneys. *Memorandum Regarding Department of Justice Task Force on Violent Anti-Government Extremists* (June 26, 2020), https://bit.ly/Memo-task-force. The Attorney General explained that the federal government had "evidence that anti-government violent extremists . . . will pose a continuing threats of lawlessness." Id. at 1. In response, the Attorney General was creating a "task force devoted to countering violent anti-government extremists." *Id*. The task force would, in part, provide training and resources to help prosecute "violent acts of anti-government extremists." *Id*. at 2.

On August 9, 2020, the Attorney General appeared on Fox News. Life, Liberty & Levin, Bill Barr: Antifa is *"New Form of Urban Guerrilla Warfare"* (Aug. 9, 2020), https://bit.ly/Barr-on-Antifa. Speaking of "Antifa," the Attorney General explained, "[t]hey are a revolutionary group that is interested in some form of socialism communism . . . .They're essentially Bolsheviks, their tactics are fascist." He went on to say that

> [i]t's a new form of urban guerrilla warfare. . . . what they do is, they are essentially shielding themselves, or shrouding themselves in First Amendment activity. And they go in to the demonstrations, which are exercising First Amendment activity, and they insinuate themselves in there to shield themselves, that's where they swim. And what they do is, they highjack these demonstrations and they provoke violence, and they have various tiers of people from the sort of top provocateurs, down through people who are their minions and sort of run the violent missions. But it's a difficult phenomenon to deal with. They're highly organized at these demonstrations.

*Id*.

In a leaked and widely reported conference call in September 2020, the Attorney General told the U.S. Attorneys from across the country—presumably including the U.S. Attorney for the Central District of California—to seek federal charges when charging demonstrators even when state charges could apply. See Aruna Viswanatha & Sadie Gurman, *Barr Tells Prosecutors to Consider Charging Violent Protesters With Sedition*, The Wall Street Journal (Sept. 17, 2020), https://bit.ly/Barr-Protesters.

//

//

10

# III. ARGUMENT

**A.    DOJ's and USAO's policy to selectively prosecute persons believed to be espousing anti-government views is unconstitutional.**

The Department of Justice (DOJ) implemented a policy of selectively prosecuting those who it believed held and espoused anti-government views. The USAO adopted, implemented, and followed that policy. That policy is facially unconstitutional and violates the Fifth Amendment and Fourteenth Amendments

### 1.    The government cannot target only those believed to hold anti-government views for prosecution.

Prosecutorial discretion is broad, but it is not "'unfettered.' Selectivity in the prosecution of criminal laws is . . . subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citation omitted). "[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,'" id. (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)), including the exercise of protected statutory and constitutional rights, *see Hartman v. Moore*, 547 U.S. 250, 256 (2006). "A defendant cannot be convicted if he proves unconstitutional discrimination in the administration of a penal statute." *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) (citing *Two Guys from Harrison-Allentown, Inc. v. McGinley*, 366 U.S. 582, 588 (1961)).

Selective prosecution claims are analyzed according to ordinary equal protection standards. *Armstrong*, 517 U.S. at 465; *Wayte*, 470 U.S. at 608. "To establish impermissible selective prosecution, a defendant must show that others similarly situated have not been prosecuted and that the prosecution is based on an impermissible motive." *United States v. Lee*, 786 F.2d 951, 957 (9th Cir. 1986) (citing *Wayte*, 470 at 608). "Discriminatory purpose 'implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *United States v. Brown*, 9 F.3d 1374, 1376 (8th Cir. 1993) (quoting *Wayte*, 470 U.S. at 610).

11

## 2.     The prosecutorial policy had a discriminatory effect.

The evidence establishes that within the last five years there were thousands of reported arson cases in the Central District of California—hundreds of which were known to the federal government—and that the USAO did not choose to prosecute stand-alone arson cases until President Trump and the Attorney General instructed the USAO to target individuals associated with the George Floyd protests. *See* Ex. C-M. As a result, the effect of the USAO's prosecuting decisions have been felt exclusively by those who the President and Attorney General identified as being associated with Black Lives Matter, Antifa, and the "radical left," all of which they consider to be anti-government groups. No other alleged arsonist has faced federal prosecution for a stand-alone arson case in 14 years in this District.

For purposes of analyzing the discriminatory effect of the USAO's policy, the applicable comparison group is all individuals whom the USAO could charge federally for arson either under § 844(f), as Wilson and Beasley were charged here, or § 844(i), as others involved in the protests were charged. Section 844(f) jurisdiction applies to property "in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance." Wilson does not concede the constitutionality of § 844(f), but assuming arguendo that the statute is constitutional, then it has the ability to sweep in many of the state court offenses described in the data above in Section II.B. For instance, state arson cases involving banks, museums, and other buildings that are the beneficiary of federal loans or federal grants would all fall under the scope of § 844(f). Regarding vehicle arsons specifically, cars manufactured by General Motors, Chrysler, or Ford in the timeframe from 2008 to 2013 would likely be covered by § 844(f) given the financial bailout of the Detroit auto manufacturers. *See*, e.g., Chris Woodyard, *GM bailout played out over five years*, USA Today (Dec. 9, 2013), https://bit.ly/GM-bailout; Phoebe Wall Howard, Ford took $6B government loan in 2009—and debt still haunts the company, Detroit Free Press (Aug. 1, 2020), https://bit.ly/Ford-bailout.

12

Jurisdiction under § 844(i) also casts a wide net. Section 844(i) covers property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Arson to shopping centers, apartment complexes, churches, banks, museums, hotels, and other businesses used in interstate commerce could be federally prosecuted under the same interstate nexus jurisdictional theory used to prosecute the other protest case defendants who were charged under § 844(i)—i.e., *Tillmon, Alvarado,* and *Espriu*.[1] Arson to vehicles would also fall under § 844(i)'s jurisdiction considering that vehicles, which frequently are driven from state to state, are typically used in interstate commerce. Keeping in mind the relevant comparison group for subsections (f) and (i) while examining the pertinent crime data outlined in Section II.B shows the discriminatory effect of the prosecution in the protest cases.

The city of Los Angeles by itself has documented hundreds of reported arson cases in the last five years. Many of those arsons were committed on vehicles, much like in this case. *See* Ex. E-M. Others occurred at shopping malls, apartment buildings, houses of worship, liquor stores, banks, museums, hotels, and other businesses used in interstate commerce and which may have received federal funding. *See id.* The arson of many of these buildings or businesses could have been federally prosecuted under either § 844(f) or § 844(i).

---

[1] *See*, e.g., *United States v. Garcia*, 768 F.3d 822, 828 (9th Cir. 2014) (holding "damage to a rental apartment building satisfies the jurisdictional provision of 18 U.S.C. § 844(i)"); *United States v. Renteria*, 557 F.3d 1003, 1010 (9th Cir. 2009) (holding that a trier of fact could have found a "synagogue was used for interstate or foreign commercial purposes in addition to religious purposes"); *United States v. Mahon*, 804 F.3d 946, 952-53 (9th 2015) (finding that a local "Diversity Office regularly engaged in activities that affected interstate commerce" by, inter alia, "employ[ing] several forms of media and a dedicated phone line" and hosting events that "drew thousands" to the city); *United States v. Shriver*, 838 F.2d 980, 982 (8th Cir. 1988) ("It is clear that the destruction of a tavern that receives interstate shipments of liquor . . . falls within § 844(i)."). *See also Gulf Coast Hotel–Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 505 (5th Cir. 2011) ("bringing out-of-state tourists to hotels to play golf . . . falls squarely within the Supreme Court's Commerce Clause jurisprudence"); *Gibbs v. Babbitt*, 214 F.3d 483, 493-94 (4th Cir. 2000) (finding an interstate commerce nexus where the "eradication" of an endangered species "would have a substantial effect on interstate commerce"); *Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*, 701 F.3d 1345, 1351 (11th Cir. 2012) (finding interstate commerce nexus where a "[m]useum invites and receives thousands of admission-paying visitors from beyond Florida").

13

Similarly, the Los Angeles District Attorney's Office filed hundreds of state arson cases in the last four years. Ex. N. The USAO did not seek to federally prosecute any of these cases. That is so even though the USAO "increased the number of criminal defendants charged by more than 41 percent" between 2018 and the start of the pandemic in 2020.[2] Nor did the USAO prosecute any stand-alone arson cases in the Central District in the last four years despite the fact that there were several much more damaging arsons during this time.[3]

The stark reality is that there were only two federal arson violations charged in the last four years before the protests and both were charged in conjunction with more serious charges. These violations were filed in *Beal* and *Wright*. In *Beal*, the defendant was charged with use of a weapon of mass destruction resulting in death in violation of 18 U.S.C. § 2332a(a)(2); use of a destructive device during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c); possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d); and malicious destruction of a building resulting in death in violation of 18 U.S.C. § 844(i). 19-cr-0047-JLS, ECF No. 66 at 1. One person died. The charges in *Wright* stemmed from a public corruption investigation that began after the FBI received information that the defendant, the mayor pro tem, was

---

[2] *See* DOJ, *United States Attorney Nick Hanna to Leave Justice Department after Serving as Chief of Federal Law Enforcement Officer in L.A. for 3 Years*, (Jan. 4, 2021), https://www.justice.gov/usao-cdca/pr/united-states-attorney-nick-hanna-leave-justice-department-after-serving-chief-federal

[3] *See*, e.g., Brian Rokos, *Convicted arsonist now accused of torching Orange County business, burglarizing fire stations*, Orange County Register (Aug. 17, 2019) (reporting on suspect accused of "causing more than $5 million in damage as diversions to draw firefighters out of their stations in Orange, Riverside, San Bernardino and Los Angeles counties so he could burglarize them"), https://bit.ly/OC-arson; Christopher Damien, *Brandon McGlover pleads guilty to arson charges in Cranston Fire case, gets 12 years in prison*, Desert Sun (Feb. 14, 2019) (describing sentencing in Riverside County Superior Court where defendant was charged with one count of damage to five or more inhabited structures, nine counts of arson for uninhabited structures, and five counts of arson for inhabited structures, and where one victim died of a heart attack as he raced to evacuate), https://bit.ly/Cranson-fire; Jonah Valdez, *Arson suspect arrested in separate incident a day after San Gabriel Mission fire*, San Gabriel Valley Tribune (July 22, 2020) (reporting arson that burned a 215-year-old mission, one of 21 missions in California), https://bit.ly/Mission-fire.

14

receiving bribes. 17-cr-229-JGB, ECF No. 1, ¶ 4. The attempted arson charge arose when, during the investigation, the defendant solicited the assistance of an informant to commit arson for insurance fraud. *Id.* ¶ 5. The defendant was charged with bribery of programs receiving federal funds and the attempted arson of a building. *Id*., ECF No. 11. Unlike in Wilson's case, neither defendant in *Beal* or *Wright* was facing a stand-alone federal arson charge. In fact, before the protest arson charges in the summer of 2020, the last stand-alone arson charge was filed in 2007 and was related to the arson trees in a national forest. *See* Exs. A & B; *United States v. Haag*, 07-cr-1010-JFW, ECF No. 1.

Further, as evidenced by the FBI's Uniform Crime Report, at a minimum the federal government knew of hundreds of arson cases committed in this District. *See* Exs. J-M. The government did not federally prosecute any of those arson cases. Even if only a subset of those cases fell into the broad jurisdiction covered by § 844(f) and § 844(i), there would still be dozens and possibly hundreds of cases that related to property funded in part by the federal government or property related to interstate commerce that the USAO knew of and could have federally prosecuted. See Armstrong, 517 U.S. at 470 (positing that evidence that "similarly situated persons . . . were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court" would tend to support a selective prosecution claim). But the USAO did not federally prosecute a stand-alone arson case until the President and Attorney General expressly called for the USAO to target those they believed held anti-government views. Thus, the discriminatory effect of the USAO's prosecuting decisions is evident.

### 3.    The prosecutorial policy had an explicit discriminatory purpose.

The DOJ's prosecutorial policy was facially unconstitutional, and its direct admissions of discriminatory purpose came with surprising clarity and frequency. As recounted more fully in Section II.C.1 above, the Attorney General created a policy explicit in its discriminatory intent to target for federal prosecution and harsher treatment those who were alleged to have engaged in criminal conduct during and in relation to

"anti-government" protests. On May 30, 2020, the Attorney General issued a statement explaining that "all of our 93 U.S. Attorneys across the country, will support . . . local efforts and take all action necessary to enforce federal law."[4] The next day, the Attorney General explained that "Federal law enforcement actions will be directed at apprehending and charging the violent radical agitators who have hijacked peaceful protest and are engaged in violations of federal law."[5] That same day, the Attorney General explained that "federal law enforcement" needed to "go after the guys throwing the bricks and . . . running around starting fires. They have to be taken from the street and arrested and processed."[6] On June 26, 2020, the Attorney General sent a memorandum to all United States Attorneys, advising that "he was creating a "task force devoted to countering violent anti-government extremists," including by prosecuting them.[7] In September, the Attorney General told the country's United States Attorneys to seek federal charges when charging demonstrators even when state charges could apply.[8]

The DOJ's prosecutorial policy and directives, adopted and implemented by the USAO, were unequivocal: people accused of criminal offenses associated with the protests were considered "anti-government," were to be treated more severely than other criminal defendants, and were to be selected for federal prosecution. Wilson was prosecuted pursuant to that unconstitutional policy.

///

///

---

[4] DOJ, *Attorney General William P. Barr's Statement on the Death of George Floyd and Riots*, (May 30, 2020), https://bit.ly/Barr-statement.

[5] DOJ, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism,* (Mar. 31, 2020), https://bit.ly/Barr-on-terrorism.

[6] *President Trump's call with US governors over protests*, CNN (June 1, 2020), https://bit.ly/Trump-call.

[7] *Memorandum Regarding Department of Justice Task Force on Violent Anti-Government Extremists* (June 26, 2020), https://bit.ly/Memo-task-force.

[8] *See* Aruna Viswanatha & Sadie Gurman, *Barr Tells Prosecutors to Consider Charging Violent Protesters With Sedition*, The Wall Street Journal (Sept. 17, 2020), https://bit.ly/Barr-Protesters

16

**4.     There is sufficient direct and circumstantial evidence that Wilson's prosecution was based on a discriminatory purpose.**

Even if the DOJ's explicit statements of discriminatory purpose were themselves not enough, there is also significant additional direct and circumstantial evidence of the prosecution's discriminatory purpose. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." V*illage of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 266 (1977). Such evidence could include the "impact of the official action," a "clear pattern" of the effect of the state action, "the historical background" of the official decision, "specific sequence of events leading up to the challenged decision," "departures from the normal procedural sequence," "legislative or administrative history . . . especially where there are contemporary statements of members of the decisionmaking body, minutes of its meetings, or reports," or, in rare circumstances, even the testimony of members of the decision-making body concerning the purpose of the official action. *Id*. at 266-68.

The facts in this case demonstrate that the government's decision to prosecute Wilson was based on a discriminatory purpose. The "impact" of the USAO's prosecuting decisions has been disproportionately felt by those who the President and Attorney General identified as belonging to so-called anti-government groups. *See id*. at 266. The only federal arson violations charged in the last four years unrelated to ongoing federal investigations or other more serious criminal conduct were filed against people who were perceived as being involved in protest and anti-government activities; namely Wilson and Beasley, and the defendants in *Alvarado, Espriu*, and *Tillmon*. The protest cases were the first stand-alone arson cases filed in the last 13 years before 2020. The "historical background," "contemporary statements" of the decision-maker, and "specific sequence of events leading up to" the decision to prosecute Wilson all support the conclusion that the decision to prosecute him was based on impermissible grounds. *Village of Arlington Heights*, 429 U.S. at 266-68. As explained above, the Attorney General's statements and

17

instructions to the United States Attorneys were clear that people accused of committing criminal offenses during or in relation to the protests were to be treated more harshly and selected for federal prosecution. *See Hartman*, 547 U.S. at 264 ("A prosecutor's disclosure of retaliatory thinking on his part, for example, would be of great significance in addressing the presumption of retaliatory purpose.") The "clear pattern" of federal prosecutions bears this out: the only characteristic distinguishing Wilson from the thousands of arson cases in this District that are not charged federally is that he is believed to hold and espouse anti-government views. The pattern of charged cases overwhelmingly points to the discriminatory purpose underlying the prosecutorial decision here.

It is worth noting that the issue is not what Wilson actually believed, but rather the views the government ascribed to him. Government action violates equal protection where it is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles*, 368 U.S. 448, 456 (1962), which includes "the exercise of protected statutory and constitutional rights," *Wayte*, 470 U.S. at 608. The government is similarly prohibited from punishing individuals more harshly simply for being "a member of a group unpopular with the government." *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) (en banc); *see id*. (remanding for hearing on selective prosecution for allegedly targeting defendant as a member of Chicago Area Draft Resisters). Here, President Trump and Attorney General Barr imputed anti-government views to people like Wilson, and the USAO received a top-down directive from Trump and Barr to target and federally prosecute people like him. Accordingly, Wilson falls into the category of a protected "arbitrary classification," which in this case consists of individuals with imputed anti-government views. *See Oyler*, 368 U.S. at 456.

The facts in *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), offer a useful comparison. In Steele, the defendant was prosecuted for refusing to participate in the U.S. census in Hawaii. *Id*. at 1151. Although there were at least six other Hawaiians who refused to participate in the census whom the government was aware of, only the

18

defendant and three others were prosecuted. *Id*. The evidence showed that the four who were prosecuted were identified by census-takers as "hard core protesters" attempting to incite others to subvert the law. The Ninth Circuit found that the defendant had established that the prosecution was a result of invidious discrimination targeting him because of his First Amendment protected speech. The Court reversed the conviction, explaining that "[t]he government offered no explanation for its selection of defendants, other than prosecutorial discretion. That answer simply will not suffice in the circumstances of this case. Since Steele had presented evidence which created a strong inference of discriminatory prosecution, the government was required to explain it away . . . by showing the selection process actually rested upon some valid ground." *Id*.

Here, in the absence of some other explanation for the government's choice, the only reasonable inference is that the government selected Wilson for federal prosecution because the alleged offense was associated with expressive conduct and the government believed he held and espoused anti-government views.

*      *      *

The government's admissions and the direct and circumstantial evidence show that the DOJ and USAO's prosecutorial policy had a discriminatory effect and purpose to target those it believed held anti-government views. Such invidious discrimination violates the Equal Protection Clause of the Fourteenth and Fifth Amendments. Accordingly, the Court should dismiss the indictment here.

**B.    At a minimum, Wilson is entitled to discovery because there is "some evidence" of discriminatory effect and discriminatory purpose.**

On May 14, 2021, Wilson made a discovery request for the items referenced in the proposed order to compel discovery filed with this motion. On June 25, 2021, the government responded to the discovery request with a letter explaining why it believed the requested materials should not or could not be turned over. Wilson, however, is entitled to discovery on his claim of selective prosecution because there is more than just

1  "some evidence" tending to show the existence of the essential elements of the defense.

2  *Armstrong*, 517 U.S. at 468.

3      To obtain discovery on a selective prosecution claim a defendant must show only

4  that there is "some evidence tending to show the existence of the essential elements of

5  the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468

6  (citation omitted). *See United States v. Bass*, 536 U.S. 862, 863 (2002) ("a defendant who

7  seeks discovery on a claim of selective prosecution must show some evidence of both

8  discriminatory effect and discriminatory intent"). To satisfy the discriminatory effect

9  prong, "some evidence" means "a credible showing" that "similarly situated individuals

10  . . . were not prosecuted." *Armstrong*, 517 U.S. at 465, 470. As to the discriminatory

11  intent, neither the Ninth Circuit nor the Supreme Court has had occasion to explain what

12  "some evidence" means in the context of discriminatory intent for selective prosecution.

13  But in the equal protection context, from which standards selective prosecution claims

14  draw, *id*. at 465, courts look to the "impact," "pattern," "historical background,"

15  "sequence of events," "departure from normal procedural sequence," and "contemporary

16  statements by the decision-maker," *Village of Arlington Heights*, 429 U.S. at 266-68.

17      In circumstances where there are direct admissions by the government of a

18  discriminatory intent both the Supreme Court and the Ninth Circuit have suggested that

19  the prosecution's admission is sufficient to obtain discovery. *See Armstrong*, 517 U.S. at

20  469 n.3 ("reserve[ing] the question whether a defendant must satisfy the similarly

21  situated requirement in a case 'involving direct admissions by [prosecutors] of

22  discriminatory purpose'"); *United States v. Sellers*, 906 F.3d 848, 856 & n.11 (9th Cir.

23  2018) (explaining that "evidence of discriminatory intent may be enough to warrant

24  discovery"). If a defendant is entitled to discovery on a selective prosecution claim, "the

25  scope of discovery must bear a reasonable relationship to the decision to prosecute the

26  particular defendant." *United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995).

27  ///

28  ///

20

1          **1.      There is "some evidence" of discriminatory effect and purpose**
2                    **here.**

3          As described above, the DOJ and USAO chose to federally prosecute and subject
4   to harsher punishment those whose criminal offenses were related to "anti-government"
5   expressive conduct. The Attorney General's disclosure of the discriminatory intent by
6   itself is sufficient to entitle Wilson to discovery on the decision to prosecute him. *See*
7   *Armstrong*, 517 U.S. at 469 n.3; *Sellers*, 906 F.3d at 856 & n11; *see also Gomez-Lopez*,
8   62 F.3d at 306. But there is more.

9          The evidence establishes there was a discriminatory effect. From 2016 to 2020
10  there were thousands of reported arson cases in the Central District and over a thousand
11  known to the federal government, yet those individuals were not federally prosecuted.
12  *See* Exs. C-M; *Armstrong*, 517 U.S. at 470. The effect of the government's prosecuting
13  decisions has been felt exclusively by those believed to hold anti-government views. *See*
14  *supra* Section III.A.2.

15         The direct and circumstantial evidence also establishes the prosecution's
16  discriminatory purpose. As explained above, there are direct admissions by the
17  government of its intent to selectively prosecute those engaged in anti-government
18  protests. The evidence of the "impact," "pattern," "historical background," "sequence of
19  events," "departure from the normal procedural sequence," and "contemporary
20  statements by the decision-maker," also support the conclusion that the government's
21  prosecutorial decisions were based on discriminatory intent. *See supra* Section III.A.3;
22  *United States v. McGraw-Hill Co., Inc.*, No. CV 13–779–DOC, 2014 WL 1647385, at
23  *12 (C.D. Cal. Apr. 15, 2014) (finding "evidence of discriminatory intent is
24  circumstantial but sufficient" to merit discovery).

25         Wilson has presented evidence that creates a strong inference of discriminatory
26  effect and intent and meets the "some evidence" standard for discovery.

27  ///

28  ///

21

1

## IV.  CONCLUSION

2      The government unconstitutionally targeted Wilson for selective prosecution for

3  the reasons outlined above. Accordingly, Wilson respectfully asks this Court to dismiss

4  the indictment. In the alternative, Wilson is entitled to discovery on a motion for selective

5  prosecution because he has shown "some evidence" of discriminatory effect and purpose.

6  If the Court denies his motion to dismiss, Wilson respectfully requests that the Court

7  instead compel the government to produce the requested discovery listed in the proposed

8  order.

9

10                                              Respectfully submitted,

11                                              CUAUHTEMOC ORTEGA
                                                Federal Public Defender
12

13  DATED:  October 12, 2021               By   /s/ Howard Shneider

14                                              Howard Shneider
                                                Deputy Federal Public Defender
15                                              Attorney for Nathan Wilson

16

17

18

19

20

21

22

23

24

25

26

27

28